**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ORR IRON, INC., Respondent.**

**No. 74–1149.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 19, 1974.

Decided Jan. 13, 1975.

Elliott Moore, Deputy Associate Gen. Counsel, William M. Bernstein, Atty., National Labor Relations Board, Washington, D. C., for petitioner.

Joseph A. Yocum, Evansville, Ind., for respondent.

Before SWYGERT, Chief Judge, CUMMINGS, Circuit Judge, and WYZANSKI, Senior District Judge *.

PER CURIAM.

This case comes upon the application of the National Labor Relations Board pursuant to Section 10(e) of the National Labor Relations Act, as amended (61 Stat. 136, 73 Stat. 519, 29 U.S.C., Sec. 151 et seq.), for enforcement of its December 12, 1973 order, reported at 207 N.L.R.B. No. 133, commanding Orr Iron Inc. to cease and desist from unfair labor practices interfering with employees in the exercise of their Section 7 rights, and directing the Company to offer reinstatement with back pay to a former employee Collins, to mail to each of nine unfair labor practice strikers a letter rescinding the Company's so-called "replacement" letter of July 10, to offer immediate and full reinstatement to those strikers, and to make them whole for any loss they may have suffered as a result of the Company's failure to reinstate them beginning five days after their unconditional applications for reinstatement. The order further directs the Company to bargain with the Union upon request and to post appropriate notices and to mail a copy of such a notice to each of the unfair labor practice strikers.

The issues presented are whether substantial evidence on the record as a whole supports the Board's finding that the Company interfered with its employees in the exercise of their Section 7 rights; whether substantial evidence on the record as a whole supports the Board's finding that the Company violated Section 8(a)(1) and (3) of the Act by discharging employee Jim Collins for refusing to remove a Union button, and by subsequently terminating nine unfair labor practice strikers; and whether the Board properly found that the Company violated Section 8(a)(5) and (1) of the National Labor Relations Act by refusing to bargain with the Union as the representative of its employees, and finally whether a bargaining order is an appropriate remedy for the Company's unfair labor practices.

This court has jurisdiction to consider the N.L.R.B.'s application for enforcement of its December 12, 1973 order. 61 Stat. 136, 73 Stat. 519, 29 U.S.C. Sec. 151 et seq.

The record as a whole shows that there is substantial evidence to support the Board's findings of fact, which are briefly summarized below:

The Company operates an industrial division and a steel division located in a five-story building and two adjoining warehouse buildings. The warehouse crew of the steel division has a day shift and a night shift, each made up of a working foreman and three to five steel handlers, each of whom is paid at an hourly rate. The warehouse is under the overall supervision of Charles Merrick, an Operations Manager, who is assisted by a warehouse Superintendent James Simpson. The Company employed Collins as a steel handler and relief truck

---

* Senior District Judge Charles Edward Wyzanski, Jr., of the District of Massachusetts, is sitting by designation.

driver during the latter part of 1967 when the Company operated only one shift. When the Company instituted a second shift in 1968, it frequently transferred Collins to the night shift on a temporary basis, for the purpose of training a new night shift foreman in cutting, loading, and equipment operation. Collins was told that the reason for these new assignments was his superior knowledge and experience in the work. After a few temporary assignments of this character, Collins, in accordance with his express preference for regular first shift work, was returned to the first shift following each training period, with the exception of the final one, when he was given a regular truck-driving assignment.

In October 1970 Collins asked Superintendent Simpson to take him off the truck-driving assignment. Simpson informed Collins that the only available job was as night-shift foreman. Collins accepted the job on the condition that Simpson would get a replacement and return Collins to his former day-shift work. Although Simpson agreed to this condition he in fact did not send any replacement, and Collins remained as night-shift foreman at the wage rate he had received before he was assigned to truck-driving and so remained as night-shift foreman until his discharge in June 1972.

When assigned as night-shift foreman, Collins made it plain that he did not want to have anything to do with transfers of employees, and Vice President Fridrich agreed that he would take care of such matters. As night foreman, Collins was not included in supervisory meetings nor given authority to recommend or affect actions involving wages, hiring, suspension, discipline, layoff, recall, transfer, assignment, granting of time off, adjustment of grievances, or other terms and conditions of employment. Nor was he even consulted about such matters.

In 1969 while training a foreman, Collins told one of the steel handlers to do his work or to go home, and on another occasion Collins spoke with Simpson about the poor attendance of another employee whom he sent to Simpson. But these were incidental and extraordinary exceptions to Collins' regular practice, and when looked at against a total background do not in any way show that Collins had the authority to discipline or recommend the discipline of employees as one of his regular functions. It was Collins' practice to report to work 15 minutes before the beginning of the night shift, and to receive from Superintendent Simpson the clipboard of invoices to be filled that night. Collins assigned work to the steel handlers. This work consisted in taking one of the invoices, accumulating the merchandise specified in that invoice, placing it on a truck or skid, performing any cutting or banding required by the invoice, and depositing the material together with the invoice in a place where other employees would complete the work or load the merchandise.

Collins spent almost all of his time performing manual labor like that performed by other employees on the shift. But he did occasionally go where the steel handlers were working to see what they were doing. His primary responsibility was to get the trucks loaded. At the end of the shift, Collins left copies of complete invoices on Simpson's desk.

Superintendent Simpson was ordinarily present during the first hour and a half of the night shift. Warehouse Operations Manager Merrick sometimes remained longer. After both of them had gone home Collins had standing instructions to call one of them if any problem arose. This he did frequently.

Problems of overtime were handled by Collins if less than an hour was involved. But otherwise, Superintendent Simpson made the necessary determinations.

Turning now from a review of the facts with respect to Collins' employment and duties, we address ourselves to the facts shown with respect to the Union's organizing campaign.

On June 26, 1972, the Union began its campaign. On that day employee Don

Nally secured Union authorization cards from ten employees.

On June 29, 1972 the Union had a meeting of the Company's employees at the Union Hall. All of the night shift and four of the day shift warehouse employees attended and received Union buttons. The night shift employees returned to work wearing the buttons on the fronts of their shirts. That night Collins fastened Union buttons to the hard hats of the night-shift employees. The next morning Collins, reporting to perform overtime work, wore his hard hat with the Union button attached and during the morning fastened such buttons to the hard hats of the day crew.

On June 30, 1972 the Company received by hand a letter addressed to Vice President Fridrich demanding recognition of the Union in truck-driver and warehouse unit, and requesting a meeting. The Company on the same day refused to recognize the Union, questioned its majority, and declined to meet with its representatives. Later that day Operations Manager Merrick sought to speak with Collins alone, but the latter told him if he wanted to talk, he could do so to the employees as a group. Then Merrick approached another employee, Allender, and asked him what the button was. About noon, Merrick approached Collins again and asked what was going on and what the employees wanted; and when Collins replied that they wanted more money, Merrick asked how much. But after Collins told him, Merrick walked away. At 2:45 p. m. Vice President Fridrich asked Collins to meet him, and they went to an office where Merrick and Company Secretary John Orr joined them. Fridrich said that "no supervisor of mine is going to wear a union button" and gave Collins the choice of removing the button or being fired. Collins refused to remove the insignia, and Fridrich told him that in that event he was fired. When Collins reported this termination to his fellow employees, they started to leave the warehouse to go home. Superintendent Simpson came out of his office and told the employees to report for a meeting. On reporting, they were addressed by Fridrich who told them that there never had been a union at the Company, and there was not going to be then, that he would fight it to the limit, at all costs and in any way he could. Fridrich also told the employees that he was going to give them the same choice he had given to Collins, "to go home and think about it and take the buttons off, or . . . "

Fridrich, Merrick, and Simpson left the meeting, and then Company Secretary Orr told the employees that the Company had operated for 135 years without a union, and that he did not want a union, but if that was what the employees wanted, he could do nothing about it. He told them he thought they were making a bad mistake and tried to get them to return to work. When the employees said they wanted a decent wage and job security written into a contract, Orr asked how much money they wanted and promised to take up the matter with his father, Company President Sam Orr. One of the men said that if the Company fired Collins everybody was going to walk out. Orr said that he agreed with Fridrich that Collins would have to take off the Union button or go home; whereupon the employees decided to leave the premises.

While the employees were hanging around, Simpson asked Collins if he were going to work. Collins said he wasn't going to take the button off, so Simpson said Collins was fired. Then the employees set up a picket line.

On July 10, 1972 the Company wrote letters to Collins and to each striker. To Collins the Company said that it confirmed that he had been discharged; to the strikers, the Company said that they had been permanently replaced.

 The foregoing recital, which falls within a standard pattern, makes it plain that there was substantial evidence on the record as a whole to support the Board's findings that Collins was within the meaning of the National Labor Relations Act an employee who was not a

supervisor, within the definition set forth in Section 2(11) of the Act; that there was substantial evidence on the record as a whole that the Company violated Section 8(a)(3) and (1) of the Act by discharging Collins for refusing to remove a Union button, and by subsequently terminating nine unfair labor practice strikers; that substantial evidence on the record as a whole supports the Board's finding that the Company interfered with its employees in the exercise of their Section 7 rights, in violation of Section 8(a)(1) of the Act; that substantial evidence on the record as a whole supports the Board's finding that the Company violated Section 8(a)(5) and (1) of the Act by refusing to bargain with the Union as the representative of its employees; and that a bargaining order is an appropriate remedy for the Company's unfair labor practices.

Bearing in mind the scope of our review as enunciated in Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and a host of subsequent cases, we have no doubt that on each of the subsidiary points as well as on the main conclusion, explicit and implicit in the Board's findings, the evidence is not only substantial but virtually irresistible, in supporting the ultimate order which we are asked to enforce. No doubt, particular items, for example, in connection with the functions of Collins, are ambiguous or perhaps even of a nature commonly performed by supervisory employees, but the total picture is clearly such as to show that Collins was the equivalent of a "straw boss." Nor can anyone doubt that the kind of reactions expressed by the chief executive officers and supervisors of the Company displayed that degree of hostility to union organization which every employee, sophisticated or naive, understands to be, as we understand it to be, an interference with his freedom of choice.

Insofar as the Company suggests that the proceeding before the N.L.R.B. is vitiated by the alleged bias and prejudice of the administrative trial judge, we have examined with care the record and find that the canard is wholly without merit.

Petition for enforcement of the order of the N.L.R.B. granted as prayed.