**HIGHLAND SUPERSTORES, INC.,**
Petitioner, Cross–Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent,
Cross–Petitioner.

Nos. 89–6357, 89–6561.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 12, 1990.

Decided March 14, 1991.

Rehearing and Rehearing En Banc Denied
May 1, 1991.

A. David Mikesell (argued), Honigman, Miller, Schwartz & Cohn, Detroit, Mich., for petitioner, cross-respondent.

Aileen A. Armstrong, Deputy Associate Gen. Counsel, Charles P. Donnelly, Jr., Scott MacDonald (argued), N.L.R.B., Office of the Gen. Counsel, Washington, D.C., and Elizabeth Kenney, Director, N.L.R.B., Region 13, Chicago, Ill., for respondent, cross-petitioner.

Susan Brannigan (argued), Asher, Gittler & Greenfield, Chicago, Ill., for Intervenor.

Before NELSON, Circuit Judge, WELLFORD, Senior Circuit Judge,* and MEREDITH, District Judge.**

DAVID A. NELSON, Circuit Judge.

The issue in this case is whether there was substantial evidence to support a finding by the National Labor Relations Board that six "leadmen" employed at the petitioner's warehouse were eligible to vote in a union representation election. The eligibility of the men to vote depends on whether they were or were not "supervisors" under § 2(11) of the National Labor Relations Act, 29 U.S.C. § 152(11).

A regional director of the NLRB concluded that the leadmen were in fact supervisors and thus could not vote. Shortly before the election, however, the Board reversed that determination. The leadmen were permitted to vote, and the union won the election by the narrow margin of 24 to 22. Refusing to bargain with the union, the employer petitioned this court to set aside an order in which the Board directed it to bargain. The Board filed a cross-petition seeking enforcement of its order.

As is often true where the status of low-level front-line supervisors is in question, the case is a close one. On the record presented, however, we conclude that there was sufficient evidence to support the Board's determination that the leadmen were not § 2(11) supervisors. We shall

---

* The Honorable Harry W. Wellford assumed senior status January 21, 1991.

** The Honorable Ronald E. Meredith, United States District Judge for the Western District of Kentucky, sitting by designation.

therefore grant enforcement of the Board's order.

## I

The petitioner, Highland Superstores, Inc., is a nationwide retailer of consumer electronics and appliances. It has stores in Illinois, Indiana, Minnesota, and Wisconsin that are supplied from a Highland-operated warehouse in Lansing, Illinois. The warehouse, which stocks some $60 million worth of merchandise, employs approximately 55 people.

Overseeing the entire warehouse operation, at the time in question, was an Operations Controller. A Division Operations Manager reported to him, and a Division Warehouse Manager reported to the Operations Manager. Six supervisors reported to the Division Warehouse Manager, and these supervisors oversaw the work of the six leadmen whose status is at issue here. The remaining positions, about 40 in number, were filled by material handlers and lift-truck operators.

Evidence presented at a Board hearing showed that each leadman worked with a team of five to ten material handlers and fork lift operators. The leadmen, who spent a portion of each day physically loading and unloading trucks themselves, were also responsible for paperwork associated with the flow of inventory through the warehouse and for telling their team members which trucks to work on and how much time was available to load or unload particular trucks. The leadmen were paid by the hour, with time-and-a-half for overtime. Unlike the supervisors, the leadmen did not receive a year-end bonus. It is undisputed that the leadmen had no authority to interview, hire, transfer, discharge, lay off, recall or promote other employees, or to adjust their grievances. Leadmen did play a role in evaluating the performance of other employees, although the role may have been largely reportorial, and it is unclear how much use was actually made of the evaluations. Some of the leadmen, at least, were also involved on occasion in minor disciplinary matters.

Highland has challenged the Board's decision as to the status of all six leadmen, but the resolution of the case really turns on the status of two of them: leadmen Frank Colangelo and Timothy Balmes. Messrs. Colangelo and Balmes appear to have been somewhat more involved than the others in employee evaluation and discipline, and Highland insists that they had authority "effectively to recommend action" with regard to such matters. The company further maintains that leadmen Colangelo and Balmes exercised "independent judgment" in directing the activities of their team members, and that the exercise of such authority was "not of a merely routine or clerical nature." The quoted language is important, under the governing statute.

## II

Section § 2(11) of the National Labor Relations Act, 29 U.S.C. § 152(11), defines a supervisor as

> "any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

Supervisors are not bargaining unit employees, 29 U.S.C. § 152(3), and no employer can be compelled to negotiate with representatives of a bargaining unit that includes supervisors. 29 U.S.C. § 164(a).

As Judge Posner has noted, the first of the two clauses of § 2(11) gives the definition of "supervisor" an initial appearance that turns out to be deceptively broad. If it stood alone, the first clause would make "supervisors" of, among others, anyone responsible for "[s]upervision in the elementary sense of directing another's work...." *NLRB v. Res–Care,* 705 F.2d 1461, 1465 (7th Cir.1983). The first clause does not stand alone, however, and the second clause—the portion following the

"if"—imposes a significant qualification. It limits the definition of "supervisor" to people whose direction of the work of others, etc., is not "merely routine." In adding this limitation, Congress intended to withhold § 2(11) supervisory status from "'straw bosses,' 'leadmen,' and other low-level employees having modest supervisory authority." *Res–Care*, 705 F.2d at 1466 (quoting S.Rep. No. 105, 80th Cong., 1st Sess. 4 (1947)).

Highland argues that because its leadmen told Highland employees which trucks to unload and because the leadmen allocated manpower among various jobs, they were conclusively shown to have exercised independent judgment in directing other employees in the interest of the employer. The evidence and the relevant case law, however, support the Board's conclusion that the leadmen's assignment of work was "merely routine."

The leadmen were given a schedule of incoming and outgoing trucks each day. After they received the schedule, the leadmen's authority to assign work was limited to telling employees which trucks to unload and allocating the time required to perform such tasks. The work was so routine that employees would often consult the schedule, not the leadmen, for a new assignment.

In *Williamson Piggly Wiggly v. NLRB*, 827 F.2d 1098 (6th Cir.1987), this court held that a grocery store produce manager was not a supervisor even though he had the "discretion to direct the routine activities of the produce department such as unloading trucks, stocking and rotating produce, and ordering from suppliers...." *Id.* at 1101. *See also NLRB v. First Union Management*, 777 F.2d 330, 335 (6th Cir.1985) (serving as a "lead man" with authority to make "routine assignment of tasks to others does not elevate an employee to supervisory status"). The Court of Appeals for the Fourth Circuit reached a similar conclusion in *NLRB v. Overnite Transportation Co.*, 308 F.2d 284, 289 (4th Cir.1962):

"The company argues that at the time [the alleged supervisor] was released, he handled the bills of lading and lined up the work of loading the trucks. He also aided in checking the freight. However, checking freight as it leaves the terminal is a routine job, not involving the exercise of independent judgment. And while it requires intelligence to line up the work, accomplished by arranging the bills of lading so that freight scheduled to be unloaded from the truck first will be loaded on last and be near the door and vice versa, the job does not rise to the level of a supervisor's duties."

In light of these cases, we cannot say that the Board was required to find that the leadmen's authority to assign work involved the exercise of independent judgment.

With regard to the question whether the Board was required to find that the leadmen had authority, in the exercise of their independent judgment, effectively to "reward" other employees, Highland stresses four or five pieces of evidence. David Andre, Highland's manager of human resources for a four-state region, testified that employee evaluation and discipline were part of the leadmen's job responsibilities. Michael Lovett, one of the six supervisors at the Lansing warehouse, testified that the leadmen evaluated other employees and that their recommendations were almost always followed. Leadman Balmes testified that he gave Jerry DeMario (a supervisor like Lovett) information that the supervisor used to fill out performance appraisals on the members of Balmes' team. Highland points further to a number of performance appraisals that were prepared by leadman Colangelo, although they were signed for management either by a supervisor or by the warehouse manager. The company also cites Mr. Colangelo's presence at several meetings at which a supervisor showed a team member the results of the latter's performance appraisal.

■ The Board, in response, notes that leadman Balmes indicated not only that it was supervisor DeMario who actually prepared the written evaluations, but also that DeMario sometimes changed Balmes' recommendations. Although supervisor Lovett testified that the information provided by both Balmes and Colangelo was used in

making wage decisions, Mr. Lovett did not specify how frequently it happened that positive comments resulted in pay increases. No one else explained this either. The Board points out, moreover, that the employee appraisal forms prepared by leadman Colangelo were not signed by him as a supervisor, and supervisor Lovett sometimes changed Mr. Colangelo's appraisals. As to Colangelo's presence at the review meetings, the record suggests that his role there was limited to providing factual information—and the mere reporting of facts is not enough to make the reporter a supervisor. *Laborers and Hod Carriers Local No. 341 v. NLRB,* 564 F.2d 834, 837 (9th Cir.1977).

Turning to the question whether the leadmen had authority—again in the exercise of their independent judgment—effectively to "discipline" other employees, Highland points to three instances where Mr. Colangelo or Mr. Balmes allegedly disciplined a member of his team. In the first instance, Mr. Colangelo prepared a written warning for an employee who had violated Highland's no-smoking policy. In the second, Colangelo sent one Robert Cooper home because he was "mouthing off," making it difficult for others to perform their jobs. In the third, Mr. Balmes sent an employee home because he was not "motivated."

Although Mr. Colangelo did write a disciplinary notice after the violation of the no-smoking policy, he testified that he never saw the employee violate the policy and only wrote the notice after being instructed to do so by a supervisor. With regard to sending Mr. Cooper home, Mr. Colangelo testified that he took this action only after consulting with his supervisor. Colangelo also testified that he had been reprimanded earlier for sending someone home without first consulting with the supervisor.

As to the incident in which Mr. Balmes sent an employee home, the evidence shows that Balmes notified supervisor DeMario immediately afterward. In light of Highland's repeated assertion that all the leadmen had the same authority to discipline other employees, moreover, Mr. Lovett's reprimand of leadman Colangelo for sending employees home would tend to suggest that Mr. Balmes lacked independent authority to send anyone home. Supervisory status cannot be predicated on an act that is *ultra vires.*

■ Even if Mr. Balmes had not been instructed to consult with a supervisor before sending an employee home, a solitary instance of discipline is not sufficient to confer supervisory status as a matter of law. In *NLRB v. Berger Transfer & Storage Co.,* 678 F.2d 679 (7th Cir.1982), the Court of Appeals for the Seventh Circuit held that two incidents in which a "warehouse foreman" had sent employees home for disciplinary reasons were not sufficient to turn the foreman into a supervisor. In light of the man's lack of authority to exercise any other supervisory prerogatives, the court concluded that his primary responsibility was to see that "trucks were properly loaded;" discipline was not one of his regular responsibilities. *Id.* at 688.

The *Berger Transfer* court relied heavily on *NLRB v. Orr Iron, Inc.,* 508 F.2d 1305 (7th Cir.1975), which held that the night shift foreman at a warehouse was not a supervisor even though he had told one of the employees under him to "work or go home" and had spoken with the warehouse superintendent about another employee's poor attendance. *Id.* at 1307. The *Orr Iron* court stated:

"[T]hese were incidental and extraordinary exceptions to [the foreman's] regular practice, and when looked at against a total background do not in any way show that [the foreman] had the authority to discipline or recommend the discipline of employees as one of his regular functions." *Id.*

This statement could just as well have been made in the instant case.

*Beverly Enterprises v. NLRB,* 661 F.2d 1095 (6th Cir.1981), a case analogous to this one, involved an employer's challenge to the Board's determination that licensed practical nurses who oversaw the work of nurses' aides and orderlies were not supervisors. Although the nurses submitted evaluations and disciplinary reports, these

did not rise to the level of "effective recommendations." *Id.* at 1100–1101. In the case at bar, similarly, we think it was within the Board's province to find, on the record before it, that the leadmen's recommendations were not "effective," in the statutory sense, when it came to either disciplining other employees or rewarding them.

*Beverly Enterprises* is to be contrasted with *NLRB v. Beacon Light Christian Nursing Home,* 825 F.2d 1076 (6th Cir. 1987), a case that also involved licensed practical nurses but in which the nurses were held to be supervisors. In *Beacon Light,* as we noted, there was

"clear evidence that the LPN's were responsible for evaluation and discipline. The Counseling Forms became a part of the employee's personnel record. The LPN's were expected and encouraged to use them routinely. Three or four such citations could [and normally did—see *id.* at 1078] result in formal disciplinary action...." *Id.* at 1079.

No such "clear evidence" exists in the instant case; taken as a whole, the evidence does not compel the conclusion that it was the leadmen who were effectively deciding, in the exercise of independent judgment, whether fellow team-members should be compensated more generously, sent home in disgrace, or otherwise exposed to the carrot or to the stick.

The Board's finding that the leadmen were not § 2(11) supervisors is supported, finally, by the ratio of people who did actual supervising to people who did not. The parties agree that 40 material handlers and lift-truck operators worked at the warehouse. They also agree that 10 others exercised functions that were clearly supervisory in nature. If the six leadmen had been classified as supervisors too, the warehouse would have had 16 supervisors overseeing the work of only 40 bargaining unit employees. This comes to one supervisor for every two and a half employees. Given the routine nature of the warehouse work, such a ratio would be suspect. *See Memphis Furniture Mfg. Co.,* 232 NLRB 1018, 1021 (1977), *enforced, NLRB v. Mem-*

*phis Furniture Mfg. Co.,* 616 F.2d 964 (6th Cir.1980) (one supervisor for every one and a half employees engaged in the unloading of boxcars is "clearly out of balance"); *NLRB v. Health Care Logistics, Inc.,* 784 F.2d 232, 235 (6th Cir.1986) (one supervisor for every "two or three" employees at a cabinet manufacturer is "clearly out of balance").

This factor is not necessarily offset by the fact that two of Highland's leadmen worked at hours when, for a portion of their work shifts, they happened to be the highest ranking employees on duty. *See Res–Care,* 705 F.2d at 1467 (7th Cir.1983) (a case where the union won the representation election by only one vote):

"Although [for 16 hours a day] ... the ... nurses are the highest-ranking employees on the premises, this does not ipso facto make them supervisors. A night watchman is not a supervisor just because he is the only person on the premises at night, and if there were several watchmen it would not follow that at least one was a supervisor."

■ It is important for us to remember, of course, that it is not our job to decide whether the leadmen were in fact § 2(11) supervisors. Our job is simply to determine whether there was substantial evidence to support the Board's resolution of that question. The Board's decision on supervisory status is a mixed question of law and fact that is not to be overturned if it is supported by substantial evidence. *NLRB v. Lauren Mfg. Co.,* 712 F.2d 245, 247 (6th Cir.1983). Inferences reasonably drawn by the Board from facts as found by it may not be displaced even if the court might have reached a different conclusion had it considered the matter *de novo. Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951).

Highland's petition for review is DENIED, and the Board's cross-petition for enforcement is GRANTED.

MEREDITH, District Judge, dissenting:

My learned colleagues, Judge Wellford and Judge Nelson believe that all six lead-

men were not supervisors within the meaning of the statute. I disagree. I believe, as did the Regional Director, that all six leadmen were supervisors within the plain meaning of the statute. Consequently, I believe that none of them should have been allowed to vote in the certification election.

In many circumstances, the error in finding that the leadmen were not supervisors and, thus, were entitled to vote would be harmless error because of the margin of victory or defeat for the Union. In the present circumstances, however, the Union won by a mere two votes, 24–22. Assuming that the six leadmen voted for the Union by at least a 4–2 margin, an assumption that seems perfectly valid in light of the pro-Union activity of the leadmen,[1] their votes provided the margin of victory. Had the Board followed the statute and found them to be supervisors, the Union, in order to prevail, would have to win the support of 21 of the 40 non-leadmen. Given that, with the leadmen voting, the Union only received 24 votes and given the pro-union activity of the leadmen, I find it difficult, if not impossible, to believe that 21 of the non-leadmen supported the Union. Indeed, if one is to assert that 21 of the 24 votes for the Union came from non-leadmen, then, by mathematical necessity, one has to assert that no more than 3 of the 6 leadmen voted for the Union. Because of their extensive record of pro-union activities, I find it impossible to believe that the leadmen deadlocked 3–3 or voted against the Union. Thus, the Board's decision that the six leadmen were not supervisors can hardly be characterized as harmless error. Indeed, as illustrated supra, it changed the outcome of the election.

Although I firmly believe that all six of the leadmen are supervisors within the meaning of the statute, I will concede that the supervisory status of four of the leadmen, Frank Brod, Dino Grando, Jerry Kulikowski, and Steve Powell, is less than clear. Yet, because the margin of victory was only two votes, the issue of whether these four were supervisors is actually irrelevant to the present case. As explained infra, it is clear that the other two leadmen, Tim Balmes and Frank Colangelo, performed a multitude of supervisory functions and, thus, must be considered supervisors. If, as I believe, both Mr. Balmes and Mr. Colangelo were supervisors, and, if they voted for the Union, then the election clearly was tainted. Without their votes, the election would be deadlocked at 22–22 and the Union would not be certified.

Because it is only necessary to find that two of the six leadmen were supervisors in order to invalidate the election, I will not dwell on my reasons for believing that all six leadmen are supervisors. Instead, I will explain, in some detail, why it is obvious that both Mr. Balmes and Mr. Colangelo are supervisors within the meaning of the statute.

Under the National Labor Relations Act, a "supervisor" is defined as

any individual having authority in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly direct them, or to adjust their grievances, or to effectively recommend such actions, if in connection with the foregoing the exercise of such authority is not of a merely routine or a clerical nature, but requires the use of independent judgment.

N.L.R.A., 29 U.S.C. Section 152(11) (emphasis added). Furthermore, it is clear that, in this Circuit, the exercise of any one of the various functions is sufficient to establish an employee as a supervisor. *NLRB v. Detroit Edison Co.*, 537 F.2d 239, 242 (6th Cir.1976). As explained infra, the record clearly demonstrates that there is substantial evidence that both of the men exercised a multitude of the supervisory functions on a regular basis.

There is substantial evidence that Mr. Balmes is a supervisor. For several hours each and every evening, Mr. Balmes is

---

1. Indeed, I believe that the six leadmen voted 6–0 in favor of the Union. I base this belief on the multitude of pro-union activities and statements made by the six leadmen. Mr. Colangelo, who, as explained infra, was clearly a supervisor, was particularly vocal and active in his support of pro union activities.

without supervision of any kind. For that extended period of time, he is the only authority for the men under him and his orders cannot be immediately countermanded by going to the next level. If being the sole authority for ten employees for several hours each and every evening does not constitute the responsible direction of other employees using independent judgment, then what does? Furthermore, on at least one occasion, Mr. Balmes, without consulting any of his superiors, sent an employee home for disciplinary reasons. Certainly, this action constitutes the discipline of employees. Finally, he provides performance evaluations of the employees under him to his supervisors and these evaluations are followed almost without exception. Obviously, this constitutes the effective recommendation of discipline. Under the prior case law of this Court, any one of these factors would be sufficient to make Mr. Balmes a supervisor. Yet, the Board obviously has chosen to ignore the sum of all of this evidence in making its determination. If it had looked at this evidence it would have been compelled to reach the opposite result. Thus, I am forced to conclude that the Board's decision regarding Mr. Balmes was not based on substantial evidence.

With regard to Mr. Colangelo, the evidence of supervisory functions is even more substantial than that for Mr. Balmes. When trucks arrive at the Highland loading dock during his shift, it is Mr. Colangelo, not anyone else, who determines how the trucks will be unloaded, which trucks will be unloaded first, how many men will work on each truck, and which men will work together on an unloading crew. His decisions vary greatly depending on the circumstances presented. Indeed, the trucking firms know him as the "receiving supervisor." Clearly, these actions are the direction of fellow employees in a non-routine manner requiring independent judgment. Furthermore, on at least one occasion, he disciplined an employee for smoking and on another occasion he sent an employee home for disruptive behavior. If this is not the discipline of employees, then what is it? Finally, he makes recommendations to his supervisor about the performance evaluation of those below him and these recommendations are almost universally adopted. Obviously, this practice constitutes the effective recommendation of reward and discipline. A finding of any of these functions is sufficient to make Mr. Colangelo a supervisor. The fact that the Board chose to ignore this evidence and conclude the opposite only demonstrates to me that there is no substantial evidence for the Board's decision regarding Mr. Colangelo.

Although a conclusion that Mr. Balmes and Mr. Colangelo were supervisors is sufficient to taint the election, the record shows that there is ample evidence as to the supervisory status of the other four leadmen. For example, Mr. Brod is the only supervisor on duty at least one day each week. Mr. Grando bears the responsibility of scheduling crew members to meet the fluctuations in the number of trucks arriving and departing. Finally, Mr. Kulikowski and Mr. Powell have supervisory authority that is very similar to that exercised by the other four. Thus, every one of these individuals can be regarded as a supervisor.

Because I believe that all of the six leadmen were supervisors, I believe that it was improper for them to vote in the election and, consequently, that the election was tainted. Even if I am incorrect about four of the leadmen being supervisors, it is clear that both Mr. Balmes and Mr. Colangelo were supervisors. The votes of these two are enough to taint the election requiring a reversal of the Board's decision and a new certification election in which none of the six leadmen would participate. For these reasons, I respectfully dissent.