961 F.2d 1578
 140 L.R.R.M. (BNA) 2120
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
The OHIO RIVER COMPANY, Petitioner/Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent/Cross-Petitioner.
 Nos. 91-5930, 91-5985.
 United States Court of Appeals, Sixth Circuit.
 April 22, 1992.
 
 Before MILBURN and SUHRHEINRICH, Circuit Judges, and COHN, District Judge.*
 PER CURIAM.
 
 
 1
 Petitioner Ohio River Company ("petitioner" or "company") seeks review and the Board seeks enforcement of a Board decision finding that petitioner violated federal labor law by failing to bargain with its employees' union. The sole issue presented for review is whether the Board's determination that petitioner's towboat mates had not become statutory supervisors under section 2(11) of the National Labor Relations Act ("NLRA" or "the Act") and, therefore, that petitioner violated section 8(a)(1) and (5) of the NLRA, 29 U.S.C. § 158(a)(1) and (5), by refusing to bargain with the union as the mates' certified representative is supported by substantial evidence. For the reasons that follow, the petition for review is denied, and the Board's order is enforced.
 
 I.
 A.
 
 2
 Petitioner is engaged in the transportation of coal as well as other dry cargoes in interstate commerce through the operation of a fleet of seven towboats on the Ohio River between Pittsburgh, Pennsylvania and Cairo, Illinois. Each of the towboats has a crew of ten, which includes the captain (master), pilot, the mate, a watchman, three deckhands, a chief engineer, an assistant engineer, and a cook. Towboat crews generally work 30 successive days and then have 30 successive days off.
 
 
 3
 The captain (master) has overall responsibility for the boat and has authority over every member of the crew. The pilot relieves the captain on the aftwatch. The chief and assistant engineers' duties are limited to the engine room and mechanic functions of the ship; they do not work on deck with the mate. These four individuals are excluded from the bargaining unit as supervisors.
 
 
 4
 Except for the engineers and the cook, the crew works alternating six-hour shifts and are assigned either to the forwatch (forward watch) or the aftwatch (after watch). The forwatch runs from 6 a.m. to noon and from 6 p.m. to midnight. Generally, the forwatch involves the captain, the watchman, and two deckhands. The aftwatch runs from midnight to 6 a.m. and from noon to 6 p.m. Generally, the aftwatch involves the pilot, the mate, and one deckhand.
 
 
 5
 The deck department of the towboat consists of five individuals--the mate, the watchman, and the three deckhands. One deckhand on each crew is designated as the swingman. The swingman is assigned to either watch depending upon when he is needed. Generally, the swingman is assigned to the forwatch. Under the collective bargaining agreement in effect between petitioner and the union during the period from 1986 through 1989, the swingman was determined on the basis of least seniority. The assignment of the remaining deckhands is the responsibility of the mate.
 
 
 6
 Newly hired deckhands generally start out as a swingman, then become a deckhand, then a watchman, and then a mate. Usually, such promotions are based on seniority. The normal duties of the deck crew include cleaning the barge gunnels, checking the barges for water, pumping water from the barges when necessary, checking the lines and couplings which connect the barges together, checking the running lights, performing work necessitated by the landing or locking of the towboat and its barges, and performing other routine tasks such as repainting and maintenance.
 
 
 7
 In the performance of day-to-day duties on the towboats, the mate on the aftwatch and the watchman on the forwatch direct the one or two deckhands who share the same watch. The mate usually directs one deckhand, and the watchman usually directs two deckhands. Both the mate and the watchman work with and alongside the deckhands in accomplishing these duties.
 
 
 8
 Prior to July 1988, the petitioner's business was in decline, and no new personnel were hired. Beginning in July 1988, however, petitioner's business began to increase, and new personnel, approximately 40 deckhands, were hired. At least 60 prospective deckhands passed through the first stage of the hiring process when they were selected by petitioner's recruiter for a two and one-half day deckhand orientation program. This first stage of the hiring process involved petitioner's full-time recruiter, who received and reviewed written applications, contacted all of each applicant's references, and interviewed each of the applicants. The recruiter receives guidance from petitioner's training director as to the criteria for approving applicants. This included selecting applicants who were physically fit and had performed strenuous jobs. Applicants also had to pass a medical exam, including drug screening.
 
 
 9
 After being screened by the personnel department, all recruits for deckhand positions participated in a two and one-half day orientation program in Paducah, Kentucky. It appears from the record that 47 of the 60 potential applicants successfully completed this orientation program. Petitioner characterized this orientation program as the second to last step of the hiring process.
 
 
 10
 The orientation classes were administered by petitioner's training director. These classes commenced in July 1988, and by October 1989, nine or ten classes had been held. At each of the classes, between two and six deckhand candidates were assigned to a mate who demonstrated to the candidates the kind of work they would be performing. Approximately nine of petitioner's 16 mates participated in these classes.
 
 
 11
 These classes involved some classroom work on safety and the basics of being a deckhand. The mates also took the candidates to a stationary boat for a hands-on orientation. Some of the participating mates did nothing more than prepare some of the equipment for orientation. The mates also took the candidates on a tour of the entire towboat and observed them during the hands-on portion of the training. At the end of the class, the mate made a hiring recommendation with respect to each candidate; however, it is unclear from the record as to how much training the mates received in evaluating candidates.
 
 
 12
 Of the 60 candidates who began, 13 were not recommended for hiring, leaving 47 who were recommended for hiring. Not all the company's mates served as evaluators, and one mate (Murphy) was the evaluator of 24 of the 60 candidates.
 
 
 13
 The last step in the deckhand hiring process was a 60-day probationary period. Each of the 47 candidates who had been recommended for hiring during the orientation classes was assigned to three 20-day trial cruises aboard three different towboats. During each 20-day trial cruise, each candidate worked with the deck crew, and depending upon his assignment, he received instruction from either the watchman or mate. According to petitioner, at the end of each 20-day trial cruise, the mate was to evaluate the candidate. The three evaluations (one from each 20-day trial cruise) were then to be submitted to petitioner's Port Captain, Ray Thornton, who made the final hiring determination. However, Port Captain Thornton testified that he was not always able to obtain three evaluations for the deckhand candidates. Moreover, when the mates differed in their recommendations, the Port Captain sought further input from them and made the final determination. According to Port Captain Thornton, he "believes" that he reviewed each of the evaluations submitted to him before the deckhand candidate was hired. However, in many situations, Thornton made his decision without any evaluations. It appears from the record that 29 of the 47 deckhand candidates who went through the last step of the hiring process had no mate evaluations in their personnel file, 13 had one evaluation, and five had two evaluations. None of the 47 deckhand candidates appeared to have three evaluations.
 
 
 14
 Moreover, Thornton testified that when the mate's evaluations disagreed, he made the decision. He testified that when there was only one evaluation in the file, he would check the computer, get the names of other mates who had worked with the candidate, and contact them. In addition, Thornton testified that when there was only one recommendation in the file, he would often accept it. He further testified that he knew his mates pretty well and that if the mate gave him a good evaluation of a candidate, he would accept it at face value. However, if he felt uncomfortable with the evaluation, he would not accept it. Finally, Thornton testified that on occasion he received input from persons other than the mates in deciding whether a candidate in the probationary process should or should not be hired.
 
 
 15
 In addition, mates also have some involvement in petitioner's disciplinary system. This disciplinary system is a progressive system, involving oral counseling at the first level. Petitioner contends that the mates perform some discipline because they perform oral counseling; however, the counseling is not recorded. "Conversation documents" are the next step in the disciplinary process. According to Port Captain Thornton, he has never seen a "conversation document" filled out by a mate.
 
 
 16
 From 1941 to 1955, petitioner recognized District 17 of the United Mine Workers of America, the precursor union, as the exclusive bargaining representative of employees of the company operating on the Ohio River or its tributaries. The bargaining unit included mates and watchmen, but excluded masters, pilots, chief engineers, assistant engineers, foremen, superintendents, executives, technical personnel, clerical personnel, and office help.
 
 
 17
 In 1962, the Board issued a decision and direction of election, finding District 50 of the United Mine Workers to be the appropriate bargaining representative of the existing bargaining unit. The Board excluded supervisors, captains (masters), pilots, chief engineers, and assistant engineers from the unit and included mates and watchmen in the unit on the grounds that they were not supervisors.
 
 
 18
 In 1972, Local 14262 of the United Steelworkers of America succeeded District 50 of the United Mine Workers as the exclusive representative of the employees in the bargaining unit. Local 14262 was a signatory to successive collective bargaining agreements with petitioner. These agreements covered the mates. The most recent collective bargaining agreement ran from July 1986 to June 1989.
 
 
 19
 Negotiations for a new contract between petitioner and the union, Local 14262, began on June 5, 1989. Petitioner refused to negotiate a collective bargaining agreement which covered the mates based upon its assertion that the mates had become supervisors. On June 10, 1989, the union filed a charge with the National Labor Relations Board ("NLRB") alleging that petitioner's refusal to bargain on behalf of the mates constituted an unfair labor practice. The Board's General Counsel subsequently issued a complaint. Thereafter, on June 22, 1989, petitioner and the union entered into a separate agreement providing that if applicable legal proceedings were to determine that the mates should be included in the bargaining unit, they would automatically be covered by the provisions of the existing contract covering watchmen, deckhands, and cooks, and that the parties would promptly negotiate with regard to the mates' wages and benefits.
 
 B.
 
 20
 On June 10, 1989, the union, United Steelworkers of America, Local 14262, AFL-CIO-CLC, filed an unfair labor practice charge alleging that petitioner, the Ohio River Company, had violated section 8(a)(5) of the NLRA by failing and refusing to bargain with respect to the mates employed by petitioner. The Regional Director of the Ninth Region of the NLRB issued a complaint charging petitioner with violations of section 8(a)(1) and (5) of the NLRA.
 
 
 21
 A hearing was held on October 3 and 4, 1989, before an administrative law judge ("ALJ"). On November 26, 1990, the ALJ issued a decision and order finding: (1) that petitioner's towboat mates are not statutory supervisors under the Act, and (2) that petitioner had violated section 8(a)(1) and (5) of the Act by its failure to bargain with the union with respect to the mates. Petitioner filed timely exceptions to the ALJ's decision and order with the Board.
 
 
 22
 On July 16, 1991, a three-member panel of the Board, with one member dissenting, issued a decision and order affirming the ALJ's decision. Petitioner filed a timely petition for review, and the Board filed a timely cross-application for enforcement.
 
 II.
 A.
 
 23
 Petitioner argues that the Board erred in concluding that the mates were not supervisors, and, consequently, also erred in concluding that petitioner violated sections 8(a)(5) and 8(a)(1) of the NLRA by refusing to bargain with respect to the mates. The scope of this court's review of Board findings is well-established. Where there is substantial evidence in the record as a whole to support the Board's conclusions, they may not be disturbed upon appeal. See Kux Mfg. Co. v. N.L.R.B., 890 F.2d 804, 808 (6th Cir.1989). Thus, the Board's findings of fact as well as its application of the law to the facts are subject to the substantial evidence test. See N.L.R.B. v. Ohio Masonic Home, 892 F.2d 449, 451 (6th Cir.1989). Evidence is considered substantial if it would be adequate, in a reasonable mind, to uphold the decision. See Emery Realty, Inc. v. N.L.R.B., 863 F.2d 1259, 1262 (6th Cir.1988). When the testimony is conflicting, the Board's function is to resolve questions of fact and credibility, and this court ordinarily will not disturb the credibility evaluations of the Board or of an ALJ who had the opportunity to observe the witnesses' demeanors. See N.L.R.B. v. Baja's Place, 733 F.2d 416, 421 (6th Cir.1984) (per curiam). The Board's reasonable inferences will not be displaced on review even though this court might justifiably have reached a different conclusion if the matter were before it de novo. See Turnbull Cone Baking Co. v. N.L.R.B., 778 F.2d 292, 295 (6th Cir.1985), cert. denied, 476 U.S. 1159 (1986).
 
 
 24
 Section 2(11) of the National Labor Relations Act, 29 U.S.C. § 152(11), defines a supervisor as
 
 
 25
 any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.
 
 
 26
 Supervisors are not bargaining unit employees under 29 U.S.C. § 152(3), and no employer can be compelled to negotiate with representatives of a bargaining unit that includes supervisors. 29 U.S.C. § 164(a); Highland Superstores, Inc. v. N.L.R.B., 927 F.2d 918, 920 (6th Cir.1991). The first of the two clauses of section 2(11) gives the term supervisor an initial appearance which is deceptively broad. Standing alone, the first clause would create supervisors of anyone who supervised another "in the elementary sense of directing another's work...." Id. (citing N.L.R.B. v. Res-Care, 705 F.2d 1461, 1465 (7th Cir.1983). However, the first clause does not stand alone. The second clause imposes a significant qualification by limiting the definition of "supervisor" to people whose direction of the work of others is more than merely routine. Highland Superstores, 927 F.2d at 920-21. The second clause is an expression of Congressional intent to withhold supervisory status from "straw bosses," "leadmen," as well as other low level employees having modest supervisory authority. Id.
 
 
 27
 The supervisory characteristics enumerated in section 2(11) are listed in the disjunctive, and the exercise of any one of them is not enough to make one a supervisor. See N.L.R.B. v. Lauren Mfg. Co., 712 F.2d 245, 247 (6th Cir.1983) (per curiam). In addition, regardless of the specific kind of supervisory authority at issue, its exercise "must involve the use of true independent judgment in the employer's interest before such exercise of authority becomes that of a supervisor." Id. (citing Beverly Enterprises v. N.L.R.B., 661 F.2d 1095, 1098 (6th Cir.1981)). Because of its special expertise, the NLRB is afforded broad discretion in determining whether an employee is a supervisor. See Williamson Piggly Wiggly v. N.L.R.B., 827 F.2d 1098, 1100 (6th Cir.1987). It is important for the Board not to construe supervisory status too broadly, since a worker who is deemed to be a supervisor loses his organizational rights. Id., 827 F.2d at 1100. On review, we will affirm the Board's discretionary determination provided there has been no abuse of discretion. Id.
 
 B.
 
 28
 Petitioner first argues that the mates are supervisors because they have the authority to hire new deckhands. In concluding that the mates do not have sufficient hiring authority to make them supervisors under Section 2(11) of the Act, the Board held:
 
 
 29
 In agreeing with the judge that the mates' involvement in the deckhand hiring process is not such as to warrant finding them supervisors under the Act, we rely on the following interpretation of the facts, which we believe is implicit in the judge's decision. Based on the unique circumstances described in the record, we believe the ... hiring decision is a process commencing with the initial screening, continuing through the orientation and so-called probationary phases, and culminating only at the end of the so-called probationary phase. Thus, rather than two separate hiring decisions as ... [petitioner] asserts, we view the hiring decision as a continuum at two stages of which--the orientation and so-called probationary phases-- ... [petitioner] relies on the mates' expertise and skill in evaluating candidates for employment. We emphasize that a port captain does a final review of a candidate before the hiring decision is made at the end of the so-called probationary phase.
 
 
 30
 J.A. 54-55 n. 1. The Board also found that "the so-called probationary phase of the hiring process here does not constitute a probationary period in the usual sense...." J.A. 55, n. 1.
 
 
 31
 Substantial evidence does exist in the record to support the Board's conclusion that mates are not supervisors based upon their alleged hiring authority because they lack the power to effectively recommend that deckhand candidates be hired. The crucial question in determining whether the mates are supervisors based on the alleged ability to hire new deckhands is whether their participation in these personnel actions amounts to effective recommendations that the personnel action occur. See Beverly Enterprises, 661 F.2d at 1100-01.
 
 
 32
 Substantial evidence also supports the Board's conclusion that the mates are not supervisors, based on their alleged power to hire new deckhands, because the record demonstrates that Port Captain Thornton's hiring decisions are not based exclusively on the mates' evaluations. As described above, the best Thornton could state in his own testimony was that he believed he reviewed each of the mate's evaluations, if provided to him, prior to hiring a deckhand. We note, however, that in the majority of the situations, the hiring by Thornton occurred without a recommendation from any of the mates. Furthermore, when disagreements between the evaluations existed, Thornton overruled one of them, preferring the evaluations of some of the mates over others.
 
 
 33
 Thus, we conclude that the Board properly construed the hiring process at issue in this case as a continuum. At some phases in this continuum, petitioner relied on the mates' skill and expertise in evaluating new deckhand candidates. However, because the company official who made the final hiring decision, Port Captain Thornton, relied on his own independent judgment in hiring new deckhands, the reliance on the mates as skilled employees did not give the mates the authority to make effective recommendations for hiring new deckhands. Thus, substantial evidence supports the Board's conclusion that the mates were not supervisors in this regard.
 
 C.
 
 34
 Petitioner also argues that mates are supervisors because they use independent judgment in directing and assigning work to deckhands. However, a deckhand's hours of work are determined by the watch to which he is assigned, and a deckhand normally is assigned to the watch of the deckhand he has come on board to replace. Moreover, although the swingman's schedule can be varied if necessary, especially with regard to locking and docking conditions, the identity of the swingman is determined by the contract, rather than the mate. In addition, the captain, not the mate, has the discretion to vary the swingman's schedule, and the captain authorizes any overtime.
 
 
 35
 Petitioner asserts, however, that the mates act in a supervisory capacity when they determine the hours the deckhands work by assigning their watches and by determining what work, particularly maintenance work, must be performed during the watches. Petitioner asserts that these decisions amount to a "judgment call" on the part of the mate as to which deckhand has the qualifications to do the job and that this judgment call amounts to "independent judgment" on the part of the mates. According to petitioners, these decisions render the mates supervisors pursuant to our decision in N.L.R.B. v. Beacon Light Christian Nursing Home, 825 F.2d 1076 (6th Cir.1987). The argument is misplaced.
 
 
 36
 In Beacon Light, this court found that LPN's at the nursing home were supervisors with regard to nurse's aides employed at the nursing home where the LPN's instructed the nurse's aides, were their team leaders, made patient assignments, were responsible for preparing evaluation reports, and if the LPN's were not supervisors, the nurse's aides would be providing patient care with no on-site supervision. Id. at 1079. Under these circumstances, we found that the LPN's were supervisors because they were in a position to responsibly direct the nurse's aides. Id.
 
 
 37
 However, the facts and circumstances of this case are distinguishable from that in Beacon Light. The mates were not the only "supervisors" present during the forwatch and aftwatch. The forwatch was normally staffed by the captain, the chief engineer, the watchman, and two deckhands. The aftwatch is normally staffed by the pilot, the assistant engineer, the mate, and one deckhand. It is undisputed between the parties that the captain, pilot, and two engineers are supervisors. Thus, out of a ten-man crew, four supervisors are already on board each towboat. Moreover, two supervisors are already present on both the forwatch and aftwatch. On the aftwatch, the pilot and assistant engineer are supervisors. If the mate were also a supervisor on the normal forwatch, there would be three supervisors supervising one employee. In addition, if the mate were a supervisor, there would be five supervisors on board the towboat out of a ten-man crew, a one-to-one ratio of supervisors to employees. A ratio of one supervisor to two or three employees is clearly out of balance. See N.L.R.B. v. Health Care Logistics, Inc., 784 F.2d 232, 235 (6th Cir.1986). See also Highland Superstores, 927 F.2d at 923. Thus, this case does not involve a situation like that present in Beacon Light. There, one of the factors supporting the conclusion that the LPN's were supervisors was the fact that no other supervisors were present to give direction to the nurse's aides. In this case, however, more than a sufficient number of supervisors were always present on the towboats.
 
 D.
 
 38
 Next, petitioner argues that the mates are supervisors because they have the power to evaluate and discipline the deck crew. However, the record supports the Board's conclusion that the mates have not been given the authority either to evaluate or discipline the deckhands and watchmen or to effectively recommend such action. Only one mate, Murphy, testified that he had evaluated deckhands. However, he could not remember the names of the three deckhands which he claimed to have evaluated. Moreover, Murphy did not recall that anyone in management told him to evaluate either watchmen or deckhands.
 
 
 39
 Petitioner additionally contends that the mates are supervisors because of the role they perform in oral counseling and conversation documents, the lowest steps in petitioner's disciplinary system. However, oral counseling is not recorded. Further, although conversation documents are the next step in the disciplinary process, the record contains no conversation documents from mates, and Port Captain Thornton could not recall that he had ever seen a conversation document from a mate. In addition, petitioner's training director, Brown, testified that he did not know of any training that had been given to the mates in how to use their alleged disciplinary authority. Under these circumstances, the Board properly concluded that any disciplinary authority possessed by the mates was not significant enough to constitute statutory authority. See Passavant Health Center, 284 NLRB 887, 889 (1987). Merely issuing verbal reprimands is too minor a disciplinary function to be statutory authority. Id. In addition, even the mere reporting of oral reprimands and the issuance of written warnings that do not affect job status or tenure do not constitute supervisory authority. Id.
 
 E.
 
 40
 Petitioner next argues that the mates are supervisors because it told the mates and the deck crews that they are supervisors. This is a baseless argument. The mates do not become supervisors merely because the company told them and other employees that they were supervisors and included them in management meetings. The mates become supervisors if petitioner confers supervisory authority on them which satisfies the requirement of section 2(11) of the NLRA. To allow petitioner to convert the mates into supervisors merely by telling them that they are supervisors would allow petitioner to deprive them of their bargaining rights under the Act without actually conferring supervisory status on them.
 
 F.
 
 41
 Finally, petitioner argues that the mates are supervisors because their work is not routine. However, the testimony in the record demonstrated that the mate performs the same general tasks on a daily basis, albeit that the difficulty of the tasks changes due to changing conditions on the river. Nevertheless, the record also shows that the tasks the mates are performing on a daily basis are the same ones that they have been performing for years. The only change in status would appear to be their roles in evaluation of new deckhand candidates. However, as discussed above, the mates' roles in evaluating deckhand candidates are insufficient to convert them into supervisors.
 
 
 42
 For almost fifty years, the mates have been classified as part of the bargaining unit and not as supervisors. Although not determinative, this prior history of inclusion in the bargaining unit is significant evidence as to the proper classification of employees. See Newspaper Drivers & Handlers Local 372 v. N.L.R.B., 735 F.2d 969, 971 (6th Cir.1984), cert. denied, 470 U.S. 1051 (1985).
 
 
 43
 Thus, we conclude that substantial evidence does exist to support the Board's decision that the mates are not supervisors under section 2(11) of the Act. Therefore, the Board's cross-application for enforcement of its order should be granted.
 
 III.
 
 44
 For the reasons stated, the petition for review is DENIED, and the Board's order is ENFORCED.
 
 
 
 *
 Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation