956 F.2d 269
 139 L.R.R.M. (BNA) 2672
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
AMPERAGE ELECTRIC, INC., Respondent.
 No. 91-5603.
 United States Court of Appeals, Sixth Circuit.
 Feb. 19, 1992.
 
 Before BOGGS and ALAN E. NORRIS, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Petitioner, the National Labor Relations Board ("NLRB" or "the Board"), has made application to this court for enforcement of an order of the Board against respondent, Amperage Electric, Inc. ("Amperage" or "the Company"), pursuant to section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e)
 
 I.
 
 2
 This case, arising under the National Labor Relations Act ("NLRA" or the "Act"), involves a number of alleged unfair labor practices committed by respondent employer Amperage Electric prior to and after a labor representation election which was held in September 1989. Respondent employer is engaged in the business of electrical repair and installation in Owosso, Michigan. On July 7, 1989, the International Brotherhood of Electrical Workers, Local No. 948 ("the Union") filed a petition with the Board's Regional Director seeking to represent a unit consisting of the employer's full-time and regular part-time employees. A Board-conducted representation election was held on September 8, 1989. There were eleven eligible voters; nine votes were cast for the Union and two were cast against it. On September 18, 1989, the Union was certified as the exclusive bargaining agent of the unit employees.
 
 
 3
 General Counsel for the National Labor Relations Board subsequently alleged that after the filing of the petition and prior to the election, the owner of Amperage, Kent Telesz, threatened employees with discharge and told them that it would be futile to vote in favor of a union because he would never sign a union contract. It was also claimed that Amperage modified terms of employment relating to distribution of paychecks, use of Company vehicles, and repair of tools in retaliation for the employees' protected activity. Furthermore, it was alleged that Amperage attempted to promote two employees, Kary Cooper and Dennis Morrice, out of the unit by making them supervisors.
 
 
 4
 Amperage also was charged with laying off bargaining unit employees after the election in retaliation for their support of a labor union and with discriminatorily discharging three employees, Kary Cooper, Dennis Morrice, and Gary Presley, in separate incidents in retaliation for their union activities.
 
 
 5
 A hearing in this matter was held before an administrative law judge ("ALJ"). In his decision, the ALJ found that one of the employees, Dennis Morrice, who was allegedly improperly promoted from the bargaining unit and then discharged, was a supervisor and therefore not protected under the NLRA. The ALJ ruled in favor of the Board on all the other charges.
 
 
 6
 The NLRB adopted the ALJ's rulings by order on January 4, 1991. The Board held that respondent Amperage violated Section 8(a)(1) (29 U.S.C. § 158(a)(1)) of the Act by threatening employees with discharge and plant closure if the employees selected the Union, by telling employees that it would be futile for them to select the Union as their collective bargaining representative because the Company would not sign a contract, and by attempting to promote employee Kary Cooper out of the unit because of the Union's organizing campaign. The Board also found that the Company violated Section 8(a)(3) and (1) (29 U.S.C. § 158(a)(3) and (1)) of the Act by withdrawing employee privileges because of the employees' union activities. The Board further found that the Company violated Section 8(a)(3) and (1) (29 U.S.C. § 158(a)(3) and (1)) of the Act by laying off unit employees following their selection of the Union as their collective bargaining representative in a Board-conducted election and by discharging employees Cooper and Presley because of their union activities.
 
 
 7
 The Board's order requires respondent to cease and desist from the unfair labor practices found and from any like or related violation of employee rights under the Act. The order requires respondent Amperage to offer employees Cooper and Presley immediate and full reinstatement, to make them whole for any losses they may have suffered, and to expunge from its files any reference to the disciplinary actions and firings of Cooper and Presley. The order also requires the Company to reinstate its discriminatorily withdrawn employee privileges. Finally, the order directs the Company to post an appropriate notice.
 
 II.
 
 8
 This court first must decide whether there is substantial evidence that respondent violated the Act by making unlawful threats prior to the election, by implementing new work rules in retaliation for union activities, and by laying off employees following the Union's election victory.
 
 A. Threats
 
 9
 An employer violates section 8(a)(1) of the Act when it threatens employees with plant closure or discharge if they select a union as their collective bargaining representative, Indiana Cal-Pro, Inc. v. NLRB, 863 F.2d 1292, 1301 (6th Cir.1988), or if it tells employees that it would be futile for them to select union representation. NLRB v. Naum Bros., Inc., 637 F.2d 589, 592 (6th Cir.1981).
 
 
 10
 The test for determining whether an employer has violated Section 8(a)(1) is whether the employer's conduct tends to be coercive, not whether the employees were in fact coerced. NLRB v. Okun Bros. Shoe Store, Inc., 825 F.2d 102, 105 (6th Cir.1987), cert. denied, 485 U.S. 935 (1988). The Board's findings under this test must be sustained as long as they are supported by substantial evidence, even if the reviewing court might have reached a different conclusion had the matter been before it de novo. 29 U.S.C. § 160(e); Universal Camera Corp. v. NLRB, 340 U.S. 474, 493 (1951).
 
 
 11
 In the present case, numerous employees testified before the ALJ about the threats which Telesz had made prior to the election. Their testimony constitutes substantial evidence to support the Board's finding that respondent unlawfully coerced employees during the Union's organizing campaign both by threatening plant closure and discharge and by warning them of the futility of unionization. The employees' testimony, which is mutually corroborative, indicates Telesz repeatedly threatened that he would close down the facility if the Union were voted in and told employees that they would be out of a job.
 
 
 12
 Telesz denies making such statements, indicating instead that the sole remark he made was that he didn't believe the Company needed a union and that such a statement is protected. First, the ALJ specifically stated in his findings that he did not find Telesz to be a credible witness and instead accorded credibility to the employees' statements about the threats made. The ALJ's credibility determinations must be upheld unless lacking a rational basis. NLRB v. Lakepark Indus., Inc., 919 F.2d 42, 44 (6th Cir.1990); see also NLRB v. Garon, 738 F.2d 140, 142 (6th Cir.1984). Respondent has failed to show that the ALJ's determinations lacked a rational basis. As the ALJ explained, the employee witnesses' statements were largely "mutually corroborative" and were "substantiated in significant part by admissions of Telesz." By contrast, Telesz was vague and evasive. For example, although Telesz testified that he told employees he "didn't understand why they needed a union," he also claimed that he could not "recall" asking employees why they needed a union. Also he initially testified that he could not "recall" whether he told employees that he "couldn't afford to pay union wages," but then claimed that he had not discussed wages.
 
 
 13
 Second, in regard to respondent's argument that the statements Telesz made were protected, respondent's reliance on Benjamin Coal Co., 246 NLRB No. 44 (1989), in which the Board found that an employer did not violate the Act when it told employees that it would close if forced to sustain additional operating costs, is misplaced. The Company in the present case threatened closure without linking it to any economic concerns. Moreover, when Telesz asserted that the Company "could not afford a union," he did not "carefully phrase[ ] [that statement] on the basis of objective fact to convey [his] belief as to demonstrably probable consequences beyond his control." NLRB v. Gissel Packing Co., 395 U.S. 575, 618 (1969). Rather, there was a clear "implication" that the Company would act "solely on [its] own initiative for reasons unrelated to economic necessities." Id. In such circumstances, employees would foreseeably interpret the Company's statements not as a "reasonable prediction based on available facts," but as "a threat of retaliation." Id.
 
 
 14
 For these reasons, the decision of the Board on this issue is affirmed.
 
 B. Change in Work Rules
 
 15
 For similar reasons, there is substantial evidence that the Company changed its work rules to the disadvantage of the employees in retaliation for their union activities. An employer violates Section 8(a)(3) and (1) of the Act by changing employees' benefits in retaliation for their union activities. Union Carbide Corp. v. NLRB, 714 F.2d 657, 663-64 (6th Cir.1983). During the union election campaign, the Company changed its rules by prohibiting employees from continuing to park Company vans at home at night, placing stricter limitations on the distribution of paychecks, and altering its practice of repairing or replacing employees' broken tools.
 
 
 16
 The Company does not deny that such changes took place,[1] but argues that these changes occurred because of business necessity and that the Company was forced to implement them after receiving a preliminary report from its accountant showing that at this period of time, the Company was losing money. However, the Company indicated that it did not have a copy of the preliminary quarterly report because it had thrown it away. The Company accountant did not testify at the hearing, but presumably would have had a copy of the report, if one indeed existed, which could have been introduced into evidence. Telesz did not explain why he could not have obtained a copy of the report from his accountant. The Company also failed to produce any evidence substantiating its claim that it had a "poor cash flow" in July 1989, the alleged reason for the change in its check-distribution policy. Without any proof to substantiate Telesz's self-serving statements about "business necessity," we believe the ALJ was warranted in finding that Telesz's testimony about "business necessity" was not credible. Therefore, the Board reasonably determined that the Company failed to demonstrate any credible explanation for the sudden implementation of these changes during the Union's organizational campaign.
 
 
 17
 Sudden changes of policy during a union organizing campaign constitute evidence of retaliation. NLRB v. Beads & Threads Co., A Div. of MSL Industries, Inc., 724 F.2d 282, 288 (2d Cir.1983) (timing of work rule changes occurring during union campaign "permit an inference of both antiunion bias and coercion in an attempt to chill the exercise of organizational rights"). For these reasons, the Board is affirmed on this issue.
 
 C. Layoffs
 
 18
 The Board conducted a representation election on September 8, 1989, which the Union won by a vote of nine to two. Later that afternoon, Telesz told Cooper that he "was taken [by] surprise by the election results" and that he was going to reevaluate what he was going to do with his company. Later that day, Telesz gave the employees the following written notice:
 
 
 19
 Effective 9/8/89 Amperage Electric will be closing [its] doors for inventory and reevaluation of the business.... All field staff excluding management will be given time off during this period beginning 9/8/89 at 5:00 p.m. The length or time-frame is indefinite. All keys and company tools must be turned in tonight before checks will be issued. All personal items should be removed from premises.
 
 
 20
 It is well settled that an employer violates sections 8(a)(3) and (1) of the Act when it lays off employees in retaliation for their union activities. NLRB v. Lakepark Indus., Inc., 919 F.2d at 43-44; Birch Run Welding and Fabricating, Inc. v. NLRB, 761 F.2d 1175, 1179 (6th Cir.1985).
 
 
 21
 There is substantial evidence to support the Board's finding that the Company laid off its employees in retaliation for having selected the Union. We find it significant that in laying off its employees, the Company was carrying out its pre-election threat that employees would be out of jobs if they selected union representation. NLRB v. A & T Mfg., Co., 738 F.2d 148, 150 (6th Cir.1984) (Board's inference of unlawful motive is strengthened by threats of closure and discharge prior to layoffs.) The inference of unlawful motivation is strong where, as here, the Company laid off the employees immediately after the union victory and the Company laid off only those who had been eligible to vote in the election. NLRB v. Aquatech, Inc., 926 F.2d 538, 547 (6th Cir.1991) ("the timing of the employer's actions is 'stunningly obvious' ").
 
 III.
 
 22
 We must next decide whether there is substantial evidence that respondent discharged Gary Presley because of his union activities.
 
 
 23
 The controversy about Presley's firing involves a "swearing match" between Telesz and his supporters, who contend that Presley quit, and the other employees and Presley himself, who contend that Presley had indicated he ought to think about quitting because he was so upset about Telesz's firing of Dennis Morrice, but that Presley never actually quit.
 
 
 24
 Presley and other employee witnesses testified that on October 19, 1989, Presley became upset because a fellow employee, Dennis Morrice, had been fired.[2] As Presley punched out, he hit the time clock too hard, breaking it. Telesz came out of the office and asked Presley what had happened. Presley told him that he was upset because Telesz had just fired Morrice for "no reason." When Telesz responded that he had fired Morrice because he had refused to go on a job, Presley testified that he protested and stated that "you're just looking for an excuse to fire Dennis because of our union activities." Presley added that he "ought to just go out to the truck, get [his] time card and turn the damn thing in." Telesz told him to do what he wanted. Having already punched out, Presley left work. On Friday morning, Presley stated that he called the Company's answering service at 6:00 a.m. and told the service that he was going to take a personal day. On Monday, October 23, Presley arrived at work at 6:30 a.m. and punched in, but was told that he had quit the previous Thursday, October 19, and would not be allowed to return to work.
 
 
 25
 The Company's version of this incident is that Presley broke the time clock, never mentioned that he was upset because Morrice had been fired in retaliation for union activities, and definitely stated that he was quitting.
 
 
 26
 We find that substantial evidence exists to support the Board's finding that Presley's discharge was because of his union support and a continuation of the Company's unlawful retaliation against union supporters. Presley testified that he responded to the Company's discharge of Morrice by telling Telesz that the Company was "just looking for an excuse to fire Dennis because of our union activities." The employee witnesses indicated that Presley had mentioned the firing of Morrice in the altercation. The Company's witnesses, who testified that Presley never mentioned Morrice's firing, are not credible, because there is no plausible explanation of why Presley would otherwise break the time clock. This fact coupled with the Company's earlier unlawful threats and actual retaliation for union activity support the Board's finding that Presley's union support was a motivating factor in his discharge.
 
 
 27
 Furthermore, the Company witnesses' testimony that Presley quit is not credible. Presley did not engage in any actions suggesting he intended to sever his employment permanently. Presley never turned in his time card and Telesz did not have Presley fill out a quit slip or turn in his company tools in accordance with company policy at the time of the incident. Halstead Metal Prods. v. NLRB, 940 F.2d 66, 71 (4th Cir.1991) (employees who did not submit termination notices or ask for final paychecks did not intend to resign their employment); NLRB v. Martin, 207 F.2d 655, 658 (9th Cir.1953) (employee's failure to take his tools with him establishes that he did not intend to quit his employment). Further evidence that Presley did not quit is provided by his willingness to work on Monday, October 23, and his insistence that he had not quit. See C.J. Krehbiel Co., 227 NLRB 383, 384 (1976) (employees action in showing up on Monday, ready to go to work, taken together with their immediate and repeated protests that they did not quit clearly indicate no intention on their part to quit), enf'd, 593 F.2d 262 (6th Cir.1979); NLRB v. Harry F. Berggren & Sons, Inc., 406 F.2d 239, 245-46 (8th Cir.) (employees' arrival at work as usual is inconsistent with notion that they quit), cert. denied, 396 U.S. 823 (1969).
 
 
 28
 To conclude, we agree with the Board's finding that the Company unlawfully insisted the Presley had quit as part of its attempt to retaliate against the employees for supporting and selecting union representation.
 
 IV.
 
 29
 We must next decide whether there is substantial evidence to support the Board's finding that Kary Cooper was not a supervisor and therefore was a protected employee under the Act.
 
 
 30
 First, the Board found that the Company unlawfully tried to promote Cooper to supervisory status and promote him out of the bargaining unit because he was first told he was a supervisor about three weeks before the election. There is evidence that Cooper was the employee who first contacted the Union about obtaining union representation. On the other hand, prior to the Union election, it was agreed in a stipulation that Cooper was a supervisor and not eligible to vote in the election. However, this court is not bound by this stipulation. The Board has stated that the issue of who exercises supervisory authority "can only be determined by application of the criteria set forth by Congress in Section 2(11) of the Act. No agreement of the parties can operate as substitution therefor." Servomation Inc., 235 NLRB 975, 976 n. 3 (1978). See also Newspaper Drivers & Handlers Local 372 v. NLRB, 735 F.2d 969, 971 (6th Cir.1984), cert. denied, 470 U.S. 1051 (1985). A resolution of this issue thus requires an examination of what Cooper actually did for the Company.
 
 
 31
 Section 2(3) (29 U.S.C. § 152(3)) of the Act excludes from the definition of the term "employee" "any individual employed as a supervisor...." Section 2(11) (29 U.S.C. 152(11)) of the Act defines the term "supervisor" as follows:
 
 
 32
 any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.
 
 
 33
 This court has held that an employee who performs any of the duties set forth in Section 2(11) of the Act is a supervisor for purposes of the Act. NLRB v. Baja's Place, 733 F.2d 416, 420 (6th Cir.1984). On the other hand, in enacting Section 2(11), Congress sought to distinguish between truly supervisory personnel, who are vested with "genuine management prerogatives such as the right to hire, fire, discipline or make effective recommendations with respect to such action," and employees--such as " 'straw bosses, leadmen, and set-up men' "--who enjoy the Act's protections even though they perform "minor supervisory duties." NLRB v. Bell Aerospace Co., 416 U.S. 267, 280-81 (1974); Highland Superstores, Inc. v. NLRB, 927 F.2d 918, 921 (6th Cir.1991). In the present case, the issue is whether Cooper exercised minor supervisory duties or whether he was vested with genuine management prerogatives.
 
 
 34
 First, it is useful to compare the status of Cooper with that of Dennis Morrice, whom the Board found was a supervisor. Both men were put in charge of work crews of twelve men or more when working on large jobs. Morrice, however, was clearly above Cooper in the hierarchy of the Company because his personnel file listed him as a supervisor, he made written evaluations of other employees, he had written an employee warning report, and had made suggestions on whom to lay off when times were slow. Also Telesz told employees that Morrice was his "number one man."
 
 
 35
 Kary Cooper did not have any of these indicia of supervisory status, but there is evidence that when he was on job sites that required multiple crews and Dennis Morrice or Telesz were not present, he was the person, who, as a master electrician, directed the less experienced employees.
 
 
 36
 Kary Cooper concedes that this was the case, but argues that he did not function much differently on multiple crews than when he was on the job with only one other person. He also argues that he did not have the authority to hire, fire, discipline, lay off, or promote employees, or to adjust employee grievances as Morrice did. He also testified that he did not have authority to authorize overtime work or to quote a price for changes or additional work, but would have to call back to the office to get such authorization from Telesz.
 
 
 37
 Telesz testified that Cooper did have such authority. Also, the testimony of two disinterested persons, Jeffery Martineau and Kent Curtis, who worked for Action Auto, a major customer of Amperage, indicated that they considered Kary Cooper a supervisor. Martineau testified that when he wanted changes made on the job or wanted employees to work overtime, he arranged this with Cooper or Morrice. However, Martineau did not know whether Cooper made these decisions on his own or whether he first had to receive authorization from someone above him. He also testified that he did not spend very much time at any one project. The second Action Auto employee, Kent Curtis, testified that he assumed Cooper was a supervisor because if anything needed to be done on a job site, he went to Cooper or Morrice about it and Telesz had told him that if he needed changes done on the job, these two men were the people to go to. However, Curtis also admitted that he did not know whether Cooper had to check with Telesz before he could authorize overtime work or quote price changes.
 
 
 38
 We find that there is substantial evidence to support the Board's finding that even though Cooper operated as crew chief on multiple occasions, this did not elevate him to supervisory status because he did not have the authority to exercise the kind of independent judgment that would elevate him to this status. See Highland Superstores, Inc. v. NLRB, 927 F.2d at 921 (Board not required to find that leadman's authority to tell employees which trucks to unload and to allocate manpower among various jobs involved the exercise of independent judgment); NLRB v. Aquatech, Inc., 926 F.2d at 549 (employee does not become a supervisor merely because he gives instructions to others based on his greater job skills and experience); NLRB v. KDFW-TV Inc., 790 F.2d 1273, 1278 (5th Cir.1986) (to responsibly direct is to be held fully accountable for the performance of the employees directed); NLRB v. Lauren Mfg. Co., 712 F.2d 245, 248 (6th Cir.1983) (mere giving of instructions to others is not sufficient to accord an individual supervisory status). For these reasons, we find that the Board correctly determined that Kary Cooper was not a supervisor.
 
 V.
 
 39
 Even if Cooper were not a supervisor, we must still decide whether his discharge violated the Act. The Company contends that even if Cooper were not a supervisor, his termination did not violate the Act, because he was permanently replaced while participating in a strike held on October 30 and 31, 1989.
 
 
 40
 The ALJ did not find Telesz's testimony that Cooper was permanently replaced to be credible.[3] We agree with this determination. As the ALJ explained, based on both Telesz's demeanor and evasive and vague testimony, he found Telesz to be neither a trustworthy nor a reliable witness. Telesz submitted no evidence substantiating his claim that he had to hire his brother-in-law, Zimmerman, to replace Cooper after Cooper missed one day of work while out on strike, although such evidence would normally have been within the Company's control. Moreover, Telesz's testimony about the hiring of his brother-in-law was vague; for example, while claiming to have offered the job to Zimmerman on October 31, the day the Union made its unconditional offer for the employees to return from the strike that began on the 30th, Telesz did not testify that he made the offer prior to receiving the Union's offer. Telesz's testimony is further undercut by his other unfair labor practices, including his warning to Cooper before the strike that Cooper was a supervisor and could therefore be discharged for union activity. In these circumstances, we believe the Board could reasonably conclude that Telesz had hired no permanent replacement for Cooper, but instead retaliated against him by discharging him for his union activities.
 
 VI.
 
 41
 The decision of the National Labor Relations Board is hereby AFFIRMED. For the foregoing reasons, this court orders enforcement of the Board's January 4, 1991 order against respondent Amperage Electric.
 
 
 
 [1]
 The Company ultimately replaced one of the tools it allegedly refused to repair, but this occurred only after the employee who used the tool had been discharged
 
 
 [2]
 Because the Board found that Morrice was a supervisor and therefore not an employee protected under the Act, the issue of the firing of Dennis Morrice is not before this court. However, a background note is required to indicate why Presley would be upset by the firing of Morrice. Telesz fired Morrice because he refused to work after hours on a Tuesday night. Before the union election, Morrice had an agreement with Telesz that he would not work Saturdays or Tuesday and Thursday nights because that was the time he was allowed to see his children after he and his wife were divorced. Once the union activity began, Telesz required Morrice to work on Saturdays. Before the date at issue, Morrice had never been required to work overtime on a Tuesday. When Morrice refused to work overtime on Tuesday, October 19, he was immediately fired. Further evidence that Telesz was looking for an excuse to fire Morrice was that Kary Cooper was closer to the job site where overtime work was required and upon request immediately went and took care of the overtime duties
 
 
 [3]
 The statement in the General Counsel's brief that Cooper was replaced during the strike did not preclude the ALJ from discrediting Telesz's testimony, because the Company put on evidence during the hearing alleging that it had replaced Cooper. The ALJ properly evaluated the credibility of that evidence in deciding the case