*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0179p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

DAVID WILLIAMSON, III,

*Petitioner,*

*v.*

No. 10-2241

NATIONAL LABOR RELATIONS BOARD,

*Respondent,*

INTERNATIONAL UNION OF OPERATING
ENGINEERS, AFL-CIO LOCAL 324,

*Intervenor.*

On Petition for Review of an Order of
the National Labor Relations Board.
No. 1: 7-CB-15343.

Argued: June 7, 2011

Decided and Filed: July 6, 2011

Before: COLE, CLAY, and GILMAN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Robert Charles Davis, DAVIS LISTMAN BRENNAN, Mount Clemens, Michigan, for Petitioner. Milakshmi V. Rajapakse, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent. Richard F. Griffin, Jr., INTERNATIONAL UNION OF OPERATING ENGINEERS, Washington, D.C., for Intervenor. **ON BRIEF:** Robert Charles Davis, DAVIS LISTMAN BRENNAN, Mount Clemens, Michigan, for Petitioner. Milakshmi V. Rajapakse, Julie B. Broido, Linda Dreeben, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent. Richard F. Griffin, Jr., INTERNATIONAL UNION OF OPERATING ENGINEERS, Washington, D.C., for Intervenor.

—————————————

**OPINION**

—————————————

COLE, Circuit Judge.  David Williamson, III petitions this Court for review of a final order of the National Labor Relations Board dismissing his claim that Local 324 of the International Union of Operating Engineers violated the National Labor Relations Act by fining Williamson and expelling him from membership.  Because substantial evidence supports the Board's factual findings and because the Board's interpretation of the Act was permissible, Williamson's petition for review is **DENIED**.

## I.  BACKGROUND

### A.  Factual History

In August 2005, Todd Chartier hired Williamson as a project developer and labor consultant for Chartier's new start-up company, Hydro Excavating LLC ("Hydro X"). Hydro X planned to harness a new technology, hydro excavation, to remove soil from the ground around fiber-optic and high-pressure gas lines using water pressure. Williamson's role at Hydro X was to investigate which labor unions could claim the hydro-excavation work and, of those, which would offer the most cost-effective terms. At first, Williamson was not authorized to negotiate with the unions, offer or accept any contract proposals, or otherwise bind Hydro X in any way.

In executing his duties, Williamson met with representatives from the Carpenter and Millwright unions.  He also met with Bruce Ruedisueli from the Laborers union, who told him that the Laborers were interested in a "wall-to-wall agreement" that would cover all of Hydro X's work.  Ruedisueli offered Williamson an existing Laborers collective-bargaining agreement to show the current wage rates and terms.  When Ruedisueli discussed the opportunity with his union supervisor, he was told to cease discussions with Hydro X because the type of work Hydro X performed was within the traditional jurisdiction of the International Union of Operating Engineers ("Operating Engineers").  Although the Operating Engineers had represented employees in hydro-

excavation work in the past and was the collective-bargaining representative of several other construction companies owned by the Chartier family, Williamson did not contact any unit of the Operating Engineers about Hydro X's work.

Williamson was a long-time member of Local 324 of the Operating Engineers ("Local 324"). In November 2005, Local 324's business manager filed internal charges against Williamson for "urging other unions to execute labor agreements with Local 324 Contractors and claim work falling within the traditional jurisdiction of the Operating Engineers," in violation of Article XXIV(7)(e) of the Operating Engineers' constitution. (Joint App'x ("JA") 309.) The next month, after a hearing at which Williamson did not appear, Local 324's membership voted to fine Williamson $500 and expel him from membership. The disciplinary actions were stayed while Williamson appealed the decision to the General Executive Board of the Operating Engineers.

While the expulsion was stayed, Williamson continued to work for Hydro X. In early 2006, Hydro X began collective-bargaining negotiations with Local 324, and Williamson served on the bargaining committee. Local 324 did not interfere with his performance on that committee.

Williamson's expulsion from Local 324 became effective on July 21, 2006, when the General Executive Board denied his appeal.

### B. Procedural History

Williamson filed unfair-labor-practices charges against Local 324. The National Labor Relations Board ("Board") issued a complaint on Williamson's behalf, alleging that Local 324 had violated sections 8(b)(1)(A) and (B) of the National Labor Relations Act ("Act"), 29 U.S.C. § 158(b)(1)(A)-(B), by terminating Williamson's membership based on his activities on Hydro X's behalf. After a hearing, an administrative law judge dismissed the claim under section 8(b)(1)(A), but found that Local 324 had restrained or coerced Hydro X in the selection of its representative for the purposes of collective bargaining or the adjustment of grievances, in violation of section 8(b)(1)(B).

The parties filed exceptions with the Board, which issued a decision adopting the administrative law judge's dismissal of the section 8(b)(1)(A) claim and reversing the finding of a section 8(b)(1)(B) violation.  The Board found that Williamson's activities on Hydro X's behalf during the relevant period did not fall within the scope of section 8(b)(1)(B), and thus that Local 324's expulsion of Williamson for those activities was not an unfair labor practice.  *Local 324, Int'l Union of Operating Eng'rs*, 353 N.L.R.B. 85 (2009).

Williamson petitioned this Court for review of the section 8(b)(1)(B) claim.  Because the Board's decision had been made by a two-member panel, which the Supreme Court subsequently held did not constitute a valid quorum, *see New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635 (2010), this Court remanded the case to the Board for further proceedings.  *See Williamson v. NLRB*, No. 09-2550, 2010 WL 4103021 (6th Cir. Aug. 24, 2010) (unpublished disposition).  The Board, this time with a quorum, issued a new order incorporating the reasoning of its prior decision.  *Local 324, Int'l Union of Operating Eng'rs*, 355 N.L.R.B. 125 (2010).  Williamson again petitions for review.

## II.  ANALYSIS

Under section 8(b)(1)(B) of the Act, a labor union engages in unfair labor practices when it restrains or coerces "an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances."  29 U.S.C. § 158(b)(1)(B).  Williamson argues that he was his employer's representative within the meaning of this section, such that Local 324 engaged in unfair labor practices by disciplining him.  The Board found that Williamson was not a representative within the meaning of section 8(b)(1)(B).

### A.  Standard of Review

This Court's review of the Board's decision is limited.  "The Board's findings of fact and its application of the law to those facts are *conclusive* 'if supported by substantial evidence on the record considered as a whole.'"  *United Paperworkers Int'l*

*Union v. NLRB*, 981 F.2d 861, 865 (6th Cir. 1992) (per curiam) (quoting 29 U.S.C. § 160(e)). "Where the Board has found no violation and dismissed the unfair labor practices complaint, that finding 'must be upheld unless it has no rational basis' or is 'irrational or unsupported by substantial evidence.'" *Id.* (quoting *United Mine Workers of Am., Dist. 31 v. NLRB*, 879 F.2d 939, 942 (D.C. Cir. 1989)). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, even if there is also substantial evidence for an inconsistent conclusion." *Mount Clemens Gen. Hosp. v. NLRB*, 328 F.3d 837, 844 (6th Cir. 2003) (internal quotation marks omitted). When "Congress has not spoken directly to the precise question at issue," this Court will uphold the Board's interpretation of the Act as long as it is "a permissible construction of the statute." *Id.* (internal quotation marks omitted).

### B.  Section 8(b)(1)(B) Activities

Labor unions engage in unfair labor practices when they discipline an employer representative "for acts or omissions that occur while [the] employer representative is engaged in § 8(b)(1)(B) activities." *NLRB v. Int'l Bhd. of Elec. Workers, Local 340* (*Royal Electric*), 481 U.S. 573, 585 (1987).[1] The text of section 8(b)(1)(B) only protects representatives who are engaged in collective bargaining and grievance adjustment. 29 U.S.C. § 158(b)(1)(B). The Supreme Court has extended the reach of the section to "other closely related activity," *Royal Electric*, 481 U.S. at 586, but the only activity that has been found to be closely related is interpretation of the terms of the collective-bargaining agreement, *see id.* at 581, 586.

The Board considered Williamson's activities in 2005, found that these activities were limited to gathering information and reporting it back to his employer, and concluded that gathering information was not an activity that section 8(b)(1)(B) protects.

---

[1] *Royal Electric* addresses the coercion of an employer in the selection of *supervisor* representatives. 581 U.S. at 575. Although Williamson is not a supervisor, the administrative law judge and the Board analyzed Williamson's claim as if he were. Because the Board assumes, for the purposes of this appeal, that *Royal Electric* applies to Williamson's situation (*see* Resp't Br. 16 n.5), we do the same. Accordingly, we treat section 8(b)(1)(B) and the case law interpreting it as equally applicable to supervisors, supervisor-members, and employee-representatives.

As a result, the Board found that Local 324 did not engage in unfair labor practices by disciplining Williamson for his 2005 activities. Williamson contends that the Board's decision was in error because (1) the Board should have also considered his activities in 2006; (2) substantial evidence does not support the Board's factual finding that his 2005 activities were limited to gathering information; and (3) even if his 2005 activities were limited to gathering information, those activities are "closely related" to collective bargaining and grievance adjustment. We consider each of these contentions in turn.

*1. Relevant Time Period*

We first determine the relevant time period. Williamson argues that the Board should have considered all of his activities up to July 21, 2006, the date on which his expulsion became effective, because that was the date Local 324 actually disciplined him. The Board counters that Williamson's conduct only through November 2005 is relevant, because that was the only conduct for which Local 324 disciplined him. The Board is correct.

The appropriate inquiry is whether a union member is disciplined "for behavior that occurs while he or she is engaged in § 8(b)(1)(B) duties." *Royal Electric*, 481 U.S. at 582 (emphasis omitted); *cf. also id.* at 585 n.8 ("[A member] who has been disciplined for behavior unrelated to § 8(b)(1)(B) functions is unlikely to react by altering his or her performance of § 8(b)(1)(B) tasks. Insofar as dictum . . . suggests that a union may not discipline [members] for acts or omissions that occur while the [member] is engaged in supervisory activities *other than* § 8(b)(1)(B) activities, the dictum is inconsistent with [precedent], and we disavow it."). It is uncontested that the subject of the union's discipline was Williamson's behavior prior to November 2005, the date on which Local 324 instituted proceedings against him. The date on which the expulsion took effect is therefore irrelevant, and we limit our analysis to Williamson's behavior from August to November 2005.

2. *Scope of Williamson's Activities*

Before we may analyze whether Williamson's 2005 activities were protected by section 8(b)(1)(B), we must determine the nature of those activities. The Board found that Williamson's activities during the relevant period consisted of gathering information and reporting it back to his employer; this is a finding of fact that is reviewed for substantial evidence, 29 U.S.C. § 160(e).

Chartier testified that he hired Williamson to determine which unions could claim Hydro X's work and which would be the most cost-effective before Chartier "got in negotiations" with a union. (JA 156-57.) Chartier stated that Williamson "brought back information and reported to me about who was interested, who wasn't, what direction we could possibly go and what would be the best interest." (JA 160.) Chartier would decide which union Hydro X would bargain with. Williamson himself testified that, while he could gather information for Chartier, he did not have the authority to negotiate or offer a collective-bargaining agreement at the time Local 324 instituted disciplinary proceedings against him. Furthermore, Williamson argued in his appeal to the General Executive Board of the Operating Engineers in January 2006: "My personal total involvement in this contractual process has been to gather information and report my findings to the owner. I was merely doing what I was instructed to do." (JA 318.)

In his brief, Williamson makes three arguments that his activities consisted of more than gathering information. First, Williamson claims that he obtained a letter of intent from the Millwrights indicating that the Millwrights were exploring a collective-bargaining relationship with Hydro X. However, the Board found that "the only purpose of that letter was to help the Employer obtain work." (JA 7.) This finding is supported by Williamson's own testimony that it was the Millwrights' representative who offered and drafted the letter, and that the significance of the letter was "[n]othing other than it gave us the ability to bid work" in a plant that worked with the Millwrights. (JA 215-16.)

Williamson also argues that he began drafting a collective-bargaining agreement with Ruedisueli, the Laborers' representative, in Fall 2005. However, as described

above, Williamson testified that he did not have the authority to negotiate on behalf of Hydro X at that time, and the only evidence supporting his assertion to the contrary is a vague reference by Ruedisueli to "put[ting] something together" to take back to Ruedisueli's boss and "start[ing] a rough draft of an agreement."   (JA 200-01.) Ruedisueli admitted that he did not know whether Williamson could execute any agreement, Williamson did not testify about any agreement, and there is no evidence concerning what, if anything, Williamson did to prepare any such agreement.

Finally, Williamson claims that he assisted Hydro X in resolving a prevailing-wage issue.  The only evidence supporting this contention is that Williamson "looked at some of [Chartier's] old agreements with the teamsters that were there previous[, a]nd at the time, [Chartier] had a prevailing wage issue at the bridge in Port Huron."  (JA 262.)  This is evidence that a prevailing wage issue existed, but not that Williamson did anything to resolve the issue or bring it to Chartier's attention.

Based on the above evidence, a reasonable mind could accept the Board's finding that Williamson's duties "extended only to investigation, not negotiation," during the relevant period.  *Cf. Mount Clemens Gen. Hosp.*, 328 F.3d at 844.  The Board's finding is thus supported by substantial evidence.

### 3.  *Interpretation of the Act*

Having accepted the Board's finding that Williamson's activities were limited to investigation, we turn to its legal conclusion that information-gathering is not an activity protected by section 8(b)(1)(B). Williamson contends that gathering information falls within the section's protection because it is "closely related to" collective bargaining and grievance adjustment.  Although this is a matter of first impression in this Court, our analysis is guided by the language and purpose of section 8(b)(1)(B), and the intricate history of its interpretation.

The purpose of section 8(b)(1)(B) is to ensure that a union cannot, through restraining an employer's choice of representatives, control the manner in which the employer conducts collective bargaining and grievance adjustments. *Royal Electric*, 481

U.S. at 580, 591; *cf. also id.* at 595 ("Section 8(b)(1)(B) was enacted to protect the integrity of the processes of grievance adjustment and collective bargaining—two private dispute-resolution systems on which the national labor laws place a high premium."). Specifically, this section was meant to "prevent a union from exerting direct pressure on an employer to force it into a multiemployer bargaining unit." *Id.* at 580.

Originally, the Board interpreted section 8(b)(1)(B) to apply only to union actions taken directly against employers, such as telling the employer that the union would not deal with a certain grievance adjustor or bargainer. *See id.*; *Fla. Power & Light Co. v. Int'l Bhd. of Elec. Workers, Local 641*, 417 U.S. 790, 799 (1974). In 1968, the Board greatly expanded its interpretation of section 8(b)(1)(B), holding that the section prohibited a union from disciplining supervisor-members who interpreted a provision of the collective-bargaining agreement in a way that disadvantaged the union, because "[indirect] pressure was exerted . . . for the purpose of interfering with the [employer]'s control over its representatives." *S.F.-Oakland Mailers' Union No. 18*, 172 N.L.R.B. 2173, 2173 (1968). The Board then issued a string of decisions that:

> extended § 8(b)(1)(B) to proscribe union discipline of management representatives both for the manner in which they performed their collective-bargaining and grievance-adjusting functions, and for the manner in which they performed other supervisory functions if those representatives also in fact possessed authority to bargain collectively or to adjust grievances.

*Fla. Power & Light Co.*, 417 U.S. at 800. These decisions were based on the Board's theory that any union discipline of supervisor-members for actions taken in their employers' interests would have a coercive effect. *Id.* at 802.

In 1974, the Supreme Court rejected the Board's expansive view of section 8(b)(1)(B), holding that the section did not prohibit a union from disciplining its supervisor-members for their "performance of rank-and-file work," even though that work was done in the employer's interest. *Id.* at 802-03. The Court explained:

> [Section] 8(b)(1)(B) cannot be so broadly read.  Both the language and the legislative history of § 8(b)(1)(B) reflect a clearly focused congressional concern with the protection of employers in the selection of representatives to engage in two particular and explicitly stated activities, namely collective bargaining and the adjustment of grievances. By its terms, the statute proscribes only union restraint or coercion of an employer 'in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances,' and the legislative history makes clear that in enacting the provision Congress was exclusively concerned with union attempts to dictate to employers who would represent them in collective bargaining and grievance adjustment.

*Id.* at 803.  Therefore, the Court found "[t]he conclusion . . . inescapable that a union's discipline of one of its members . . . can constitute a violation of § 8(b)(1)(B) only when that discipline may adversely affect the supervisor's conduct in performing the duties of, and acting in his capacity as, grievance adjuster or collective bargainer on behalf of the employer."  *Id.* at 804-05.  The Court went on to state that it "assume[d] without deciding that the Board's Oakland Mailers decision," which held that contract interpretation is so closely related to collective bargaining that it is included within section 8(b)(1)(B)'s protections, "fell within the outer limits of this test."  *Id.* at 805.

In *Royal Electric*, the Supreme Court reaffirmed its narrow view of the activities shielded by section 8(b)(1)(B).  In that case, the Court again rejected the Board's broad view of section 8(b)(1)(B) protection, striking down the "reservoir doctrine," which shielded from union discipline any employees who were *likely* to engage in collective bargaining or grievance adjustment in the future. *See Royal Electric*, 481 U.S. at 586-89. The Court also found that "the absence of a collective-bargaining relationship between the union and the employer" made the possibility that union discipline would coerce the employer "too attenuated to form the basis of an unfair labor practice charge."  *Id.* at 589; *accord Dille v. Williamson*, No. 87-3766, 1988 WL 79978, at *4 (6th Cir. Aug. 2, 1988) (unpublished disposition).

The Supreme Court's decisions in *Florida Power* and *Royal Electric* have made explicit that section 8(b)(1)(B) is to be interpreted narrowly and "indicated that the Board's expansion of § 8(b)(1)(B) in *Oakland Mailers* was *at best* 'within the outer

limits' of the section." *Royal Electric*, 481 U.S. at 581 (emphasis added); *accord NLRB v. Sheet Metal Workers Int'l Ass'n, Local 104*, 64 F.3d 465, 468 (9th Cir. 1995). The language of section 8(b)(1)(B) protects only the activities of collective bargaining and grievance adjustment, 29 U.S.C. § 158(b)(1)(B), and the Supreme Court added "some other closely related activity" in the course of *narrowing* interpretation of the section, *see Local 104*, 64 F.3d at 468. To date, contract interpretation is the sole activity that has been acknowledged as so closely related to collective bargaining and grievance adjustment that it is protected by section 8(b)(1)(B). In perhaps the only case since *Royal Electric* to interpret "some other closely related activity," the Ninth Circuit held that an employee-member's nondiscretionary actions in applying a collective-bargaining agreement were neither contract interpretation nor any other activity so closely related to collective bargaining and grievance adjustment as to be protected under section 8(b)(1)(B). *See Local 104*, 64 F.3d at 468-69. Accordingly, there is simply no support for Williamson's contention that the only permissible interpretation of section 8(b)(1)(B) is that it protects employer representatives whose duties are limited to gathering information. No court has applied the Supreme Court's test in such an expansive manner, and we do not believe that the Board's refusal to do so here was irrational or impermissible.

Our conclusion is further bolstered because the distinction between information-gathering on the one hand and collective bargaining, grievance adjustment, and contract interpretation on the other, is not without a difference. The activities that the Supreme Court has found section 8(b)(1)(B) to protect involve negotiations or conflicts between an employer and a particular union—negotiating or renegotiating an agreement, interpreting the agreement's terms, and following the agreement's procedures for grievances. These protected activities are qualitatively different from gathering information from multiple unions and reporting it back to the employer—in the latter, no ongoing relationship exists, no negotiations are taking place, and the employee has very little discretion. A union's interference in the information-collecting process may have some effect on which union is ultimately selected, but it does not affect how that union is bargained with and on what terms. *Cf. id.* at 468 n.3 (implying that activities

satisfy the "closely related" test only when they "affect[] the employer's collective bargaining position").

Although Williamson argues that any new company will naturally have a period of time during which it does not have an agreement with a particular union, this contention is inapposite. The Board concedes that Williamson's activities on the bargaining committee in 2006 constituted protected activities under section 8(b)(1)(B) even though no agreement was yet in place. (Resp't Br. 27.) The problem with the information-gathering activities here was not the absence of an agreement, but that no particular union had been identified, no bargaining had begun, and Williamson lacked discretion to affect any bargaining at the time. Choosing which union to bargain with is a necessary precursor to collective bargaining. But not every dealing with a union is protected under section 8(b)(1)(B). *Cf. Royal Electric*, 481 U.S. at 588. The information-gathering that Williamson performed here was not a discretionary task equivalent to interpreting contract terms, bargaining with union representatives, and adjusting grievances. As a result, the Board was not irrational in concluding that union interference with Williamson's information-gathering activities was unable to affect the performance of collective-bargaining and grievance-adjustment duties and thus not prohibited under section 8(b)(1)(B).

As a final note, it is important to recognize that section 8(b)(1)(B) protects the interests of the *employer*, not the employee-member, *Royal Electric*, 481 U.S. at 594. Moreover, the section protects the employer from specific interference; it does not generally entitle the employer to the undivided loyalty of its employees. *See id.* at 583; *Fla. Power & Light Co.*, 417 U.S. at 812-13. Because the Board had a rational basis to conclude that information-gathering is qualitatively different from the activities section 8(b)(1)(B) protects, and because Williamson has pointed to no authority suggesting that the Board's interpretation is impermissible, the Board's interpretation will stand. *Cf. Mount Clemens Gen. Hosp.*, 328 F.3d at 844.

## III.  CONCLUSION

Because the Board's finding is supported by substantial evidence and its interpretation of section 8(b)(1)(B) is rational and permissible, Williamson's petition for review is **DENIED**.