RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0187p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

FRENCHTOWN ACQUISITION COMPANY, INC.,
d.b.a. Fountain View of Monroe,
            *Petitioner/Cross-Respondent*,

                                    Nos. 11-1418/1499

        *v.*

NATIONAL LABOR RELATIONS BOARD,
            *Respondent/Cross-Petitioner.*

On Application for Enforcement of an Order of the
National Labor Relations Board.
Nos. 7-CA-53309; 7-CA-52888; 7-UC-628.

Decided and Filed: June 20, 2012

Before: MOORE, SUTTON, and STRANCH, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:** Grant T. Pecor, NANTZ, LITOWICH, SMITH, GIRARD & HAMILTON, Grand Rapids, Michigan, for Petitioner/Cross-Respondent. Ruth E. Burdick, Michelle M. Devitt, Linda Dreeben, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner.

_____

## OPINION

_____

JANE B. STRANCH, Circuit Judge. The essential question in this appeal is whether substantial evidence supports the National Labor Relations Board's conclusion that the charge nurses employed at Frenchtown's long-term-care and rehabilitation-services facility are not supervisors under the National Labor Relations Act (Act). Frenchtown maintains that the charge nurses are supervisors, but the Board determined

in a unit-clarification proceeding that they were not. Frenchtown has refused to bargain with the nurses' union as a means to seek indirect review of this determination.

Frenchtown operates Fountain View of Monroe, a nursing home offering long-term care and rehabilitation. The bargaining unit at issue consists of 43 charge nurses who work with 45 nursing aides to care for the residents. Frenchtown argues that the charge nurses are supervisors because they had the authority to assign, responsibly direct, discipline, hire, and transfer other employees, or effectively recommend these actions. Because substantial evidence supports the Regional Director's conclusion that Frenchtown failed to prove that the nurses are supervisors, we enforce the Board's order that Frenchtown bargain with the union in good faith and deny Frenchtown's petition for review.

## I. BACKGROUND

The nursing home has 119 beds and four distinct care units: Pleasant View, Meadow View, Pleasant View Heights, and Evergreen. Staffing for each unit is based on the number of residents living there. The charge nurses have been represented by the American Federation of State, County, and Municipal Employees, AFL-CIO, Local 1548 (the Union) since April 2003. Frenchtown's 45 certified nursing aides at the nursing home are represented by the United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW).

Seven stipulated supervisors manage the nursing department. Director of Nursing (DON) JoAnn Maddux heads the department. Directly under her are Assistant Director of Nursing (ADON) Jill Kontry and PM Manager Jennifer Austermiller. The Clinical Coordinators (CCs) Nicole Nutt and Jennifer Greening and Minimum Data Set Coordinators (MDSCs) are one more level down the hierarchy and immediately above the charge nurses.

In 2003 the Regional Director found the employer's charge nurses to be statutory employees and the Board denied review of that finding. After the employees voted to unionize, the Union and Frenchtown entered a collective bargaining agreement in 2004.

After that agreement expired, Frenchtown filed a unit-clarification petition in June 2009. Frenchtown sought to have the Board determine that all of the charge nurses were statutory supervisors under § 2(11) of the Act (29 U.S.C. § 152(11)). After a hearing, the Regional Director denied Frenchtown's petition in April 2010, finding that Frenchtown did not meet its burden of proof to show that the charge nurses are statutory supervisors. The Board denied Frenchtown's request for review in November 2010 based on the evidence introduced at the hearing, though it noted that it may have been error to allow Frenchtown to relitigate the previously resolved supervisor issue rather than limiting the hearing to changed factual circumstances.

Because Frenchtown refused the Union's request to bargain and to provide information, the Union filed unfair-labor-practice charges in April and November 2010. The General Counsel consolidated the cases and issued a complaint in November 2010. In its answer, Frenchtown admitted refusing to bargain but claimed that the charge nurses were statutory supervisors. The General Counsel filed a summary-judgment motion and the case was transferred to the Board.

In March 2011, the Board granted the General Counsel's motion, finding that Frenchtown violated § 8(a)(5) and (1) of the Act by refusing to bargain with the Union. The Board's order requires that Frenchtown cease and desist from the unfair labor practices and from "interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act." The Board's order also requires Frenchtown to bargain in good faith with the Union, to provide the Union with the information it requested, and to post copies of a remedial notice.

Frenchtown filed a petition for review with this court and the Board filed a cross-application for enforcement of its order.

## II. ANALYSIS

### A.     Legal framework

Our review of the Board's decisions is limited. *NLRB v. Dole Fresh Vegetables, Inc.*, 334 F.3d 478, 484 (6th Cir. 2003).  The Board's factual findings and its application of the law to those facts are conclusive "if supported by substantial evidence on the record considered as a whole."  *Id.* (quoting 29 U.S.C. § 160(e)).  This test "requires not the degree of evidence which satisfies the court that the requisite fact exists, but merely the degree that could satisfy the reasonable fact finder."  *Rochelle Waste Disposal, LLC v. NLRB*, 673 F.3d 587, 592 (7th Cir. 2012) (internal quotation marks omitted); *accord Williamson v. NLRB*, 643 F.3d 481, 485 (6th Cir. 2011) (determining that substantial evidence is evidence that a reasonable person might accept as adequate to uphold the Board's decision, "even if there is also substantial evidence for an inconsistent conclusion").  We may not disturb the Board's reasonable inferences even though we may have reached a different conclusion had the matter been before us de novo.  *V & S ProGalv, Inc. v. NLRB*, 168 F.3d 270, 275 (6th Cir. 1999).  Although we review the Board's legal conclusions de novo, *NLRB v. Good Shepherd Home, Inc.*, 145 F.3d 814, 816 (6th Cir. 1998), we uphold the Board's interpretation of the Act "as long as it is a permissible construction of the statute," *Williamson*, 643 F.3d at 485 (internal quotation marks omitted).

Only employees have the right to unionize and bargain collectively under the Act.  29 U.S.C. § 157.  The Act defines *employee* so as to exclude "any individual employed as a supervisor."  *Id.* § 152(3).  A supervisor is

> any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

*Id.* § 152(11).   The Act therefore establishes "a three-part test for determining supervisory status." *NLRB v. Kentucky River Community Care, Inc.*, 532 U.S. 706, 712-13 (2001).   Individuals are supervisors under the Act if they (1) have the authority to engage in any 1 of the 12 enumerated supervisory actions; (2) use "independent judgment" in exercising that authority; and (3) hold that authority "in the interest of the employer."   29 U.S.C. § 152(11); *accord Kentucky River*, 532 U.S. at 713.

The Board has interpreted the second requirement—using independent judgment—as requiring at a minimum that an individual "act, or effectively recommend action, free of the control of others and form an opinion or evaluation by discerning and comparing data." *In re Oakwood Healthcare, Inc.*, 348 NLRB 686, 692-93 (2006).   In addition, "a judgment is not independent if it is dictated or controlled by detailed instructions, whether set forth in company policies or rules, the verbal instructions of a higher authority, or in the provisions of a collective bargaining agreement." *Id.* at 693.[1]

Deciding whether an individual is a supervisor is a "highly fact intensive inquiry." *Kentucky River Community Care, Inc. v. NLRB*, 193 F.3d 444, 453 (6th Cir. 2000), *aff'd*, *Kentucky River*, 532 U.S. 706.   In conducting this inquiry, the Board and "reviewing courts must take care to assure that exemptions from NLRA coverage are not so expansively interpreted as to deny protection to workers the Act was designed to reach." *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 399 (1996) (deferring to the Board's decision that certain workers were not "agricultural laborer[s]" and were therefore eligible to unionize under the Act).   This court has endorsed the same principle in the context of determining whether individuals are supervisors: "it is important for the Board not to construe supervisory status too broadly, for a worker who is deemed to be a

---

[1]The term *independent judgment* is ambiguous. *NLRB v. Health Care & Retirement Corp. of America*, 511 U.S. 571, 579 (1994).   We therefore defer to the Board's interpretation so long as it is reasonable. *See Williamson*, 643 F.3d at 485.   The Supreme Court reasoned that because "the statutory term 'independent judgment' is ambiguous with respect to the *degree* of discretion required for supervisory status . . . [, i]t falls clearly within the Board's discretion to determine, within reason, what scope of discretion qualifies." *Kentucky River*, 532 U.S. at 713 (emphasis in original).   And the Court remarked that "it is also undoubtedly true that the degree of judgment that might ordinarily be required to conduct a particular task may be reduced below the statutory threshold by detailed orders and regulations issued by the employer." *Id.* at 713-14.   Because we conclude that the Board's interpretation reasonably defines the "*degree* of discretion required for supervisory status," *id.* at 713, we defer to it.

supervisor loses his organizational rights." *Williamson Piggly Wiggly v. NLRB*, 827 F.2d 1098, 1100 (6th Cir. 1987) (brackets and internal quotation marks omitted).

"[T]he party asserting supervisory status" (Frenchtown in the present case) bears the burden of proving that status by a preponderance of the evidence. *See Kentucky River*, 532 U.S. at 711-12; *accord in re Croft Metals, Inc.*, 348 NLRB 717, 721 (2006). General testimony asserting that employees have supervisory responsibilities is not sufficient to satisfy the burden of proof when there is no specific evidence supporting the testimony. *See Dole Fresh Vegetables*, 334 F.3d at 489 (holding that general statements from the plant manager asserting that the challenged employees possessed supervisory responsibilities were not sufficient to meet the employer's burden because the employer "did not present any specific evidence to support [the] statements"). "[B]ecause of the serious consequences of an erroneous determination of supervisory status," we must be particularly cautious before concluding that a worker is a supervisor when the asserted supervisory authority has not been exercised. *Jochims v. NLRB*, 480 F.3d 1161, 1168 (D.C. Cir. 2007) (internal quotation marks omitted). An employee's title does not confer supervisory authority. *Id.* "If an employee has not actually exercised supervisory authority, there must be other affirmative indications of authority. Statements by management purporting to confer authority do not alone suffice." *Id.* (internal quotation marks omitted).

Because of the Board's "special expertise," we afford it "broad discretion in determining whether an [individual] is a supervisor."**[2]** *Williamson Piggly Wiggly v. NLRB*, 827 F.2d 1098, 1100 (6th Cir. 1987) (internal quotation marks omitted). This determination is a mixed question of law and fact and thus will be upheld if it is

---

**[2]** Frenchtown ignores a decade of changed law in this Circuit by relying on a litany of historic cases to support its conclusion that we have "repeatedly confirmed" that nurses working in nursing homes are statutory supervisors. But these cases do not establish that the nurses in question are supervisors for two reasons. First, except for one unpublished case, all of these cases were decided before the Supreme Court rejected this Circuit's reasoning and held that the *employer* bears the burden of proving supervisory status. *Kentucky River*, 532 U.S. at 711-12 (rejecting this Circuit's rule that the Board bore the burden of proving that the employees were not supervisors under the Act). Second, deciding who is a supervisor is a highly fact-intensive inquiry. So "rules designating certain classes of jobs as always or never supervisory are generally inappropriate." *Jochims*, 480 F.3d at 1168; *accord Nathan Katz Realty, LLC v. NLRB*, 251 F.3d 981, 990 (D.C. Cir. 2001). The facts of the present case show that the charge nurses in question are not supervisors.

supported by substantial evidence. *Highland Superstores, Inc. v. NLRB*, 927 F.2d 918, 923 (6th Cir. 1991).

Frenchtown argues that its charge nurses are supervisors because they had the authority to assign, responsibly direct, discipline, hire, and transfer other employees, or effectively recommend these actions.[3]  We disagree.

## B.    Disciplining

Frenchtown contends that charge nurses have the power to discipline aides and effectively recommend discipline. Substantial evidence supports the Regional Director's conclusion that Frenchtown failed to satisfy its burden of proving this contention.

Only the undisputed managers discipline employees. Frenchtown's progressive-discipline policy for aides lists four types of discipline: verbal warning, written warning, three-day suspension, and termination.  These disciplines are documented on an Employee Counseling Record (ECR) form.  Frenchtown provides only one instance of a charge nurse issuing a discipline to an aide—charge nurse Thompson signing the ECR for an aide's verbal warning. A single instance of discipline does not support a finding of supervisory status. *Dole Fresh Vegetables*, 334 F.3d at 487.  Additionally, as even Director of Nursing (DON) Maddux admitted, the aides' union contract prohibits charge nurses from delivering progressive discipline, rendering Thompson's action an *ultra vires* act that directly contravenes the union contract.  Thus, the evidence offered is both a single example and unauthorized.  This does not satisfy Frenchtown's burden.

Instead of disciplining aides, charge nurses can give "one-on-one in-services" to correct the aides' performance by educating aides on what is expected of them.  Even DON Maddux conceded that these in-services are "outside of the realm of discipline."

---

[3]Frenchtown maintains in its reply brief that it also "challenges the Board's findings that its Charge Nurses do not reward, promote, suspend, discharge, evaluate employees, or adjust their grievances, as well as the Board's finding that they do not make effective recommendations in those areas."  But Frenchtown forfeited these issues by not *arguing* them in its appellate briefs. *See United States v. Johnson*, 440 F.3d 832, 845-46 (6th Cir. 2006) ("An appellant abandons all issues not raised and argued in its initial brief on appeal." (brackets and internal quotation marks omitted)); *Conley v. NLRB*, 520 F.3d 629, 638 (6th Cir. 2008) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (brackets and internal quotation marks omitted)).

Concluding that the in-services are not discipline is supported by witness testimony, Frenchtown's disciplinary policy—which contains no mention of the in-services—and the aides' union contract.[4]  For example, employees were not allowed to have a union representative with them when they received an in-service because the in-service is not a discipline.  Further, a union steward for the aides succeeded in having management rescind a disciplinary write-up for another aide based on the argument that management could not use in-services—which are educational and nondisciplinary—to support a discipline.

Because in-services are "outside of the realm of discipline," even the historic cases Frenchtown relies on are inapposite.  In *Integrated Health Services of Michigan, at Riverbend, Inc. v. NLRB*, the staff nurses were "authorized to determine whether and to what extent [nursing assistants] should be disciplined for insubordination or failure to respond to patient needs."  191 F.3d 703, 711 (6th Cir. 1999).  The nurses in *Extendicare Health Services, Inc. v. NLRB* were undisputedly empowered to "initiate formal disciplinary proceedings by completing a 'disciplinary action report.'"  182 F. App'x 412, 416-17 (6th Cir. 2006).  And the nurses in *NLRB v. Beacon Light Christian Nursing Home* filled out "disciplinary reports" that resulted in "formal disciplinary action" after repeat offenses.  825 F.2d 1076, 1077-78 (6th Cir. 1987).  Similarly, the progressive-discipline system in *NLRB v. Promedica Health Systems, Inc.* expressly included the "coachings" at issue in that case.  206 F. App'x 405, 408 (6th Cir. 2006); *accord in re Promedica Health Systems, Inc.*, 343 NLRB 1351, 1351-52 (2004).  Unlike the in-services performed by the charge nurses in the present case, the actions taken by the employees in the cited cases were expressly part of the disciplinary process.  *See also in re Oak Park Nursing Care Center*, 351 NLRB 27, 28-30 (2007) (holding that the "employee counseling forms" filled out by the nurses were a form of discipline because

---

[4]Frenchtown's attempt to use the aides' union contract to its avail is unpersuasive.  The section at issue provides that "[a]ny disciplinary action will be presented by management, but does not diminish the authority or responsibility of charge nurse to initiate a disciplinary action."  Again, DON Maddux concedes that this contract prohibits charge nurses from delivering progressive discipline.  Moreover, this language can be reasonably interpreted as providing that the contract would not nullify any authority that the charge nurses may have to discipline, rather than as affirmatively providing that the nurses do in fact have such authority.

they were an "integral part of the Employer's progressive disciplinary system in that they are used to document each phase of the disciplinary process and routinely result in actual discipline").

Frenchtown's argument that the in-services are part of the disciplinary process because they routinely lead to discipline is unpersuasive. Although DON Maddux did testify generally that in-services lead to discipline and are the first step in the disciplinary process, general, conclusory testimony that employees have supervisory responsibilities is not sufficient to satisfy Frenchtown's burden of proof. *See Dole Fresh Vegetables*, 334 F.3d at 489. And her testimony runs contrary to the significant evidence that in-services are educational rather than disciplinary in nature, such as charge nurse Cranford's testimony that DON Maddux assured her that in-services "would not lead to discipline" or the evidence that management rescinded a discipline for an aide after the union steward argued that the in-services in the aide's file could not be used to support a discipline since in-services are not disciplinary, but educational. Moreover, Frenchtown's reliance on the charge nurses' job descriptions that it created,[5] which provide that the nurses "discipline[] employees," is similarly deficient because "[t]heoretical or paper power does not a supervisor make." *New York University Medical Center v. NLRB*, 156 F.3d 405, 414 (2d Cir. 1998).

Frenchtown's purported examples fall far short. Clinical Coordinator (CC) Jennifer Greening did place an aide back on orientation following an in-service from a charge nurse. But the aide in question had previously received four or five in-services from a different nurse. So the aide had received five or six in-services total from two nurses before management took action. And there is no evidence that any of the in-services recommended whether the aide should be disciplined. Moreover, CC Greening talked to the aide herself to see what was going on before transferring the aide. This evidence hardly establishes that in-services routinely lead to discipline, let alone that the

---

[5]The language of these job descriptions mirrors the statutory language for determining supervisory status, which, as the Regional Director observed, suggests that they "have been consciously drafted to mirror the Board's shibboleths." He also accurately concluded that "the expansive power set forth in the documents is at odds with the realities." We concur with the cited principle of law that "actual authority trumps mere paper authority."

in-services are disciplines. Rather, it simply shows that in-services can bring aide errors or misconduct to a manager's attention and that the manager decides how to proceed.[6] "The fact that these [in-services] may *result* in disciplinary action is irrelevant; the [charge nurse] is acting as a conduit for information and exercises no judgment in passing the knowledge along to management." *NLRB v. Meenan Oil Co., L.P.*, 139 F.3d 311, 322 (2d Cir. 1998); *accord in re Vencor Hosp.-L.A.*, 328 NLRB 1136, 1139 (1999) (holding that nurse reports documenting poor performance or misconduct do not show supervisory authority when "[t]here is no evidence that such reports . . . automatically lead to [discipline] or otherwise affect job tenure or status).

Frenchtown's next example fares no better. Charge nurse Corin Greene gave aide Gigi Childs an in-service. According to CC Nicole Nutt, nurse Greene thought that discipline was more appropriate, and she told CC Nutt this. Nurse Greene did not support this testimony. In any event, CC Nutt decided to issue a disciplinary verbal warning to aide Childs only after discussing the underlying conduct with nurse Greene and reviewing the in-service. And the in-service does not recommend whether aide Childs should be disciplined. Once again, all this evidence shows is that the manager made the decision to discipline and that in-service merely brought performance issues to the manager's attention. This is not enough to prove supervisory status. *See Meenan Oil Co.*, 139 F.3d at 322. Further, Frenchtown's claim that in-services routinely lead to discipline is undercut by the fact that CC Nutt mentioned neither considering aide Childs's prior in-service in her file nor even checking aide Childs's file before issuing the discipline.

Frenchtown's last example is unpersuasive because the record belies the conclusions that Frenchtown attempts to draw. Frenchtown maintains that an in-service aide Ruth Burlew received on October 1 led to her suspension that same day, and then

---

[6]We doubt that sending an aide back to orientation is discipline per se: CC Greening testified that she thought the charge nurses were being too hard on the new aide, who was struggling but trying, and made the decision to send her back to orientation to give her a fresh start rather than discipline her. But even if returning the aide to orientation constituted discipline, the point stands that this discipline stemmed from the aide's repeated mistakes rather than the in-services themselves. That the aide was transferred to a new unit and eventually terminated is irrelevant because those actions were not prompted by the charge nurses' in-services, but rather by the aide's further mistakes.

an October 2 in-service led to her discharge on October 3. But the record shows that aide Burlew received a disciplinary written warning on September 18 for failing to change a urine-soaked patient. So when the manager learned that aide Burlew again failed to change a soiled patient on October 1 and 2, they simply followed the next steps of progressive discipline by first suspending and then terminating her. The in-services did not progress to a discipline; they instead informed management of a recurring problem for which discipline had already begun, and management dealt with the problem through progressive discipline. Moreover, the in-services themselves do not recommend whether aide Burlew should be disciplined. Frenchtown's evidence thus establishes at best that the in-services created a possibility of discipline, and this is not sufficient to show supervisory authority. *See Jochims*, 480 F.3d at 1170.

Switching from in-services, Frenchtown argues that the few examples of charge nurses sending aides home proves that charge nurses are supervisors. This argument is unpersuasive because the common thread running through these examples is that they involved egregious misconduct from the aides. Sending employees home for egregious misconduct does not require independent judgment. *Jochims*, 480 F.3d at 1171-72.

Frenchtown's evidence that charge nurses effectively recommend discipline is likewise deficient. The Regional Director found that the "record does not contain even one written disciplinary recommendation from any nurse." In its appellate brief, Frenchtown does not contest this finding. This alone shows that substantial evidence supports the Regional Director's conclusion that charge nurses do not effectively recommend discipline. Besides, even Frenchtown's attempts to show that the nurses exercised this power orally falls short. Aside from general, conclusory testimony that charge nurses possess this authority, the only example adduced that we have not already addressed—the firing of aide Hampton which DON Maddux alleges was based on Charge Nurse O'Rourke's oral recommendation—is unpersuasive. First, O'Rourke does not testify that she orally recommended terminating the aide. Moreover, according to the DON, that aide was terminated based on "her *progression of her discipline*. There wouldn't have been a lot of choice to do anything else." (Emphasis added.) Remarking

that the aide was terminated based on the *progression of her discipline* indicates that the decision to terminate was based on prior disciplines, not the nurse's recommendation. Even setting these problems aside, one example hardly proves that the nurses *effectively* recommend discipline. *Cf. Highland Superstores*, 927 F.2d at 922 ("[A] solitary instance of discipline is not sufficient to confer supervisory status as a matter of law.").

In sum, substantial evidence supports the Regional Director's conclusion that the charge nurses do not discipline or effectively recommend discipline. Frenchtown has failed to carry its burden on this point.[7]

## C.    Hiring

Frenchtown next argues that charge nurses can effectively recommend the hiring of aides. Yet again, however, substantial evidence supports the Regional Director's conclusion that Frenchtown did not satisfy its burden of proof on this point.

The undisputed managers control the hiring process. They solicit applications, grant and conduct interviews, and decide when and whom to hire. Although a job description for charge nurses states that they have the power to "recommend[] hires," as we have noted, "[t]heoretical or paper power" such as job descriptions "does not a supervisor make." *New York University Medical Center*, 156 F.3d at 414. Charge nurses' involvement in the hiring process is limited to interviewing candidates when managers are too busy, an occurrence which has happened only a few times.

To be sure, DON Maddux testified generally that she had hired four to five aides whom charge nurses had interviewed and given input on, but with one exception discussed below, her testimony lacked important details. She did not specify who these

---

[7]Without noting the Regional Director's full explication of the factual record, Frenchtown takes issue with the Regional Director's conclusion that the alleged examples of discipline orally recommended by a charge nurse are not effective because managers conducted their own independent investigation before deciding to issue a discipline. This court has concluded that the Act "does not preclude supervisory status simply because [a] recommendation is subject to a superior's investigation." *Caremore, Inc. v. NLRB*, 129 F.3d 365, 370 (6th Cir. 1997). But ruling that a manager's independent investigation does not *preclude* a finding of supervisory status is a far cry from holding that the existence of that investigation does not matter. On the contrary, whether a manager independently investigates before acting on a recommendation is a key factor that must be considered when undertaking the highly fact-intensive inquiry to determine whether an alleged supervisor effectively recommends discipline.

aides were; what precisely the charge nurses said about the aides; what role or weight the charge nurses' input played in hiring the aides; who else, if anyone, reviewed the applications; or who made the final decisions. General testimony asserting that employees have supervisory responsibilities is not sufficient to satisfy Frenchtown's burden of proof. *See Dole Fresh Vegetables*, 334 F.3d at 489. The exception is charge nurse Angela Theisen's interview of aide Jayme Kilbert, who was later hired. DON Maddux testified that Theisen strongly recommended hiring Kilbert after interviewing her and followed up twice to ask Maddux why Kilbert hadn't been hired yet. But Theisen denies these facts. She testified that she merely alerted Maddux that Kilbert had called to inquire about the status of her application and to add a reference. Theisen denied recommending Kilbert and stated that she was merely expressing her opinion in a handwritten note that explained why Kilbert was "worth a shot"—a descriptor quite at odds with Maddux's testimony that Theisen was very impressed with Kilbert and thought she was great. Even if we assume that Theisen's opinion constituted an effective recommendation to hire (a conclusion we very much doubt), this isolated instance does not suffice to confer supervisory status. *See Dole Fresh Vegetables*, 334 F.3d at 487 (holding that a single instance of an employee interviewing an applicant and passing along to an undisputed supervisor his opinion of the applicant's experience and knowledge was insufficient to prove supervisory status); *Cf. Highland Superstores*, 927 F.2d at 922 ("[A] solitary instance of discipline is not sufficient to confer supervisory status as a matter of law.")

Moreover, the testimony of the other charge nurses who interviewed potential aides buttresses the conclusion that the charge nurses lacked the power to effectively recommend hiring. Only one of these four nurses testified that she recommended that an applicant be hired. But the applicant was not hired, undercutting Frenchtown's argument that recommendations were effective. Another nurse reported to management that the applicant was "nice" and "clean"—descriptions that do not amount to a recommendation either way—and that applicant was not hired. The final two nurses explicitly denied making any recommendations and did not know whether the applicants were hired. Because the preponderance of the evidence shows that charge nurses did not

have the supervisory power to effectively recommend hiring, it follows even more strongly that substantial evidence supports the Regional Director's conclusion that Frenchtown failed to meet its burden of proof.

### D.    Assigning

The next issue is whether the charge nurses have supervisory authority to assign employees or to effectively recommend assigning employees. "The Board has construed the term 'assign' to 'refer to the act of designating an employee to a place, appointing an employee to a time, or giving significant overall duties, i.e., tasks, to an employee.'" *Mars Home for Youth v. NLRB*, 666 F.3d 850, 855 (3d Cir. 2011) (quoting *Oakwood Healthcare*, 348 NLRB at 689) (ellipses omitted). In the healthcare context, *assign* "encompasses the charge nurses' responsibility to assign nurses and aides to particular patients." *Oakwood Healthcare*, 348 NLRB at 689. Nurses use independent judgment in making these assignments when they weigh the needs of a patient against the skills or special training of staff. *Id.* at 693. In terms of assigning work, nurses are not supervisors by virtue of simply instructing an "employee [to] perform a discrete task"; they instead must designate "significant overall duties to an employee" in order to be a supervisor.[8] *Id.* at 689.

Frenchtown first contends that the Regional Director's conclusion that charge nurses do not assign significant overall duties to aides is not supported by substantial evidence. Aides' daily duties are prescribed in the care kardex, activities of daily living (ADL) sheets, and preprinted daily assignment sheets. These documents inform aides in great detail what to do for each resident and also set forth general duties like stocking linen and cleaning showers and wheelchairs. Although charge nurses update the kardex, none of these documents are created by charge nurses. And the kardex is also updated by MDSCs, CCs, and aides. Based on the record, substantial evidence supports the conclusion that charge nurses do not assign significant duties to aides.

---

[8]The term *assign* is not defined in the Act and is ambiguous. We find the Board's interpretation of *assign* to be reasonable and accord it deference. *See Mars Home for Youth*, 666 F.3d at 855 (deferring to the Board's interpretation of *assign* because that interpretation is reasonable).

Frenchtown next challenges the Regional Director's conclusion that charge nurses do not assign aides to particular patients or, in the alternative, that any such assignments do not require independent judgment. The record, however, does not support Frenchtown's claim.

Charge nurses' involvement in dividing up the sets of residents that aides will care for and in making adjustments to these assignments when necessary is marginal at best. Several nurses and aides testified that the aides typically divide up these sets themselves and fill out the assignment sheet accordingly. In addition, aides swap residents and rooms when necessary to accommodate changes in patient number and resident or family preferences. Other testimony shows that when charge nurses do become involved in these decisions, they do so only after consulting with aides. Assigning work "through a cooperative process" is not an exercise of supervisory powers. *Hosp. Gen'l Menonita v. NLRB*, 393 F.3d 263, 267 (1st Cir. 2004).

Frenchtown failed to overcome this testimony with specific examples of charge nurses assigning aides. The conclusory testimony it adduces is insufficient to carry its burden of proof under the Act. Other portions of the record establish that the nurses sometimes make routine adjustments to patient assignments, such as pulling an aide from a resident because the resident requests it, or requesting another aide to help out a struggling aide when the struggling aide specifically asked that the nurse request another aide to help. The testimony that nurse Dozier assigned aide Bullard to assist a newer aide with a shower is not an example of *assigning* under the Act because nurse Dozier was simply instructing the aide "to perform a discrete task," rather than designating "significant overall duties" as required by the Act. *Oakwood Healthcare*, 348 NLRB at 689. Further, Frenchtown did not provide actual examples of nurses adjusting patient assignments that also described the factors the nurse considered in making the adjustment, a showing necessary to establish independent judgment. Moreover, the concrete example in Charge Nurse Dozier's testimony of a charge nurse modifying the aides' division of patients is insufficient because the record reveals that Dozier modified the aide's division of patients under the guidance of management. Giving assignments

based on management's instructions does not show the requisite independent judgment. *See NLRB v. Aquatech, Inc.*, 926 F.2d 538, 549 (6th Cir. 1991).

Once again, substantial evidence more than supports the Regional Director's conclusion that Frenchtown failed to prove that the charge nurses assigned aides under the Act.

**E.    Transferring**

Frenchtown next argues that the nurses are supervisors because of their ability to transfer aides. Substantial evidence again supports the Regional Director's conclusion that Frenchtown failed to satisfy its burden of proof on this point.

Temporary transfers of aides to ensure adequate staffing levels among the four units is accomplished using a float sheet, which determines which aides are transferred. The float sheet makes selecting which aide to transfer a routine choice rather than a decision requiring independent judgment. On one occasion, however, two charge nurses who had to transfer an aide chose to retain their more experienced aide rather than consult the float sheet. Frenchtown argues that this shows the nurses exercised independent judgment in transferring aides. But as the Regional Director observed, "[t]he record does not clarify whether the nurses simply retained their more senior aides, thus making their choices more routine than evaluative." And even if the nurse's choice showed judgment, these two isolated instances are not enough to support a finding of supervisory status. *Cf. Dole Fresh Vegetables*, 334 F.3d at 486-87 (holding that two examples of alleged supervisors completing and signing written warnings to other employees was not sufficient to satisfy the employer's burden of proof that the alleged supervisors had the authority to discipline).

Frenchtown also points to a permanent transfer as evidence that charge nurse Lisek effectively recommended aide Farris's transfer to another unit. Lisek told DON Maddux and CC Greening that the aide was struggling at Pleasant View and suggested that the aide might do better at Pleasant View Heights, which was slower-paced. Later, CC Greening told DON Maddux that she was going to transfer the aide to the Heights

because it wasn't working out for the aide at Pleasant View.  There is no evidence concerning whether CC Greening relied on nurse Lisek's suggestion in making this decision.  Substantial evidence therefore supports the Regional Director's conclusion that Frenchtown failed to prove that the charge nurses transfer or effectively recommend the transfer of aides.

**F.      Responsibly directing**

Frenchtown's final argument is that the charge nurses responsibly directed the aides.  We disagree.  The Board has held that a person directs other employees when "that person decides what job shall be undertaken next or who shall do it."  *Oakwood Healthcare*, 348 NLRB at 691.  If that direction "is both 'responsible (as explained below) and carried out with independent judgment," then that person is a supervisor.  *Id.* Direction is responsible only if "the person directing and performing the oversight of the employee [is] accountable for the performance of the task by the other, such that some adverse consequence may befall the one providing the oversight if the tasks performed by the employee are not performed properly."  *Oakwood Healthcare*, 348 NLRB at 691-92.  Frenchtown argues that this accountability rule is based on an unreasonable interpretation of the Act.

Before turning to the merits of Frenchtown's challenge, we must determine whether we have jurisdiction to do so.  The Board contends that we lack jurisdiction to review the reasonableness of the Board's accountability rule because Frenchtown did not raise it during the proceedings before the Board.  But Frenchtown did argue in its Petition for Review that because the charge nurses acted to remedy aide errors, the nurses responsibly directed the aides, even if the nurses were not disciplined. Frenchtown concluded that its failure to discipline nurses for the aides' errors "should not have any bearing on the Region's supervisory analysis."  Under this interpretation of the Act, supervisory status turns on whether the alleged supervisor acted to correct the mistakes of employees underneath them.  But this interpretation is at odds with *Oakwood Healthcare's* interpretation that supervisory status turns on whether the alleged

supervisor could suffer adverse consequences for those mistakes.  Frenchtown therefore did challenge the Board's accountability rule.

Turning to the merits of this rule, we must defer to the Board's interpretation of ambiguities in the Act so long as they are reasonable.  *Williamson*, 643 F.3d at 485.  The phrase *responsibly to direct* is not defined in the Act and is ambiguous.  *Health Care & Retirement Corp.*, 511 U.S. at 579.  Our court addressed this phrase more than 60 years ago, reasoning that "[t]o be responsible is to be answerable for the discharge of a duty or obligation."  *Ohio Power Co. v. NLRB*, 176 F.2d 385, 387 (1949).  The word *answerable* certainly encompasses the idea of being accountable.  Picking up on this common understanding of *answerable*, the Fifth Circuit expanded on the meaning of *responsibly to direct*: "To be responsible is to be answerable for the discharge of a duty or obligation.  In determining whether direction in any particular case is responsible, the focus is on whether the alleged supervisor is held fully accountable and responsible for the performance and work product of the employees he directs."  *NLRB v. KDFW-TV, Inc.*, 790 F.2d 1273, 1278 (5th Cir. 1986) (internal citations and quotation marks omitted).  This is the definition the Board adopted in *Oakwood Healthcare*, 348 NLRB at 691-92.  Not only do we find it a reasonable interpretation of responsible, but it is an interpretation that fits comfortably within the ambit of the more general interpretation that this court set forth in *Ohio Power Co.*  We are not alone in finding this interpretation reasonable.  *See Mars Home for Youth*, 666 F.3d at 854 (deferring to the Board's interpretation of *responsibly to direct* because that interpretation is reasonable); *Rochelle Waste Disposal*, 673 F.3d at 594 (deferring to the Board's interpretation of *responsibly to direct* under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)).

Substantial evidence supports the Regional Director's conclusion that Frenchtown failed to show that its charge nurses are held accountable for the job performance of its aides.  Frenchtown relies on the nurses' job descriptions and their evaluations to argue that nurses knew they were accountable for the performance of aides.  But "paper power" like these documents is insufficient to prove supervisory

status. *New York University Medical Center*, 156 F.3d at 414. Moreover, these documents do not convey that nurses may suffer adverse consequences for the aides' performance. Managers' statements on the evaluations that nurses "use leadership" and "supervise" aides do not specifically inform them that they could face discipline for poor aide performance. Moreover, Frenchtown has not shown that these evaluations affect the nurses' terms and conditions of employment. Although DON Maddux testified that the evaluations could affect promotions or lead to discipline,[9] there was no evidence that this had ever happened. And DON Maddux admitted that the evaluations had no effect on the nurses' pay.

Frenchtown's reliance on conclusory and general statements that nurses are held responsible for the well-being of the patients is also unpersuasive. Such statements do not satisfy Frenchtown's burden of proof: "Statements by management purporting to confer authority do not alone suffice. . . . [B]eyond the statements or directives themselves, what the statute requires is evidence of actual supervisory authority visibly translated into tangible examples demonstrating the existence of such authority." *Beverly Enterprises-Massachusetts, Inc. v. NLRB*, 165 F.3d 960, 963 (D.C. Cir. 1999) (internal citations and quotation marks omitted); *accord Dole Fresh Vegetables*, 334 F.3d at 489.

The specific examples Frenchtown adduces do not help advance its case. Several of these supposed examples of accountability involve only educational in-services, which are not disciplinary and which do not affect the terms and conditions of employment. They are not evidence of nurses facing the risk of actual adverse consequences. Frenchtown cites three actual disciplines without analyzing them; all reveal that the nurses are held accountable for their own performance rather than that of aides. The discipline examples Frenchtown discusses at greater length suffer from the same defect. Charge nurse Peggy Mayner received a verbal warning for failing to document weights. Under Frenchtown's weight policy, aides obtain resident weights

---

[9]DON Maddux analogized the evaluations to in-services, which are not disciplines and do not lead to disciplines.

and charge nurses are to record these weights on the Medication Administration Record (MAR). Nurse Mayner's verbal warning specifically warns her that "[n]o holes should be left in the MAR's [sic] and TARs." So she was disciplined for her own performance, not that of an aide.[10]

The closest Frenchtown comes to demonstrating accountability is the verbal warning given to charge nurse Heather Ouellette. But even this falls short. The discipline listed the following offenses: "snacks still in the unit; incontinent residents were not changed timely; no direction provided to staff; hand washing not being done; call lites [sic] not answered timely; also observed 3 [aides] off the unit at the same time." But as the Regional Director observed, the discipline does not specify whether any of these errors were the aides' errors rather than nurse Ouellette's.[11]

Frenchtown's failure to satisfy the accountability rule is underscored by the evidence that the charge nurses were not disciplined for aide errors, even though there were many and even though some were serious. When asked why the nurses hadn't been disciplined in instances involving aide errors or misconduct, DON Maddux testified that the nurses in those situations were blameless. As the Seventh Circuit aptly observed, when a "lower level employee performs inadequately, and the purported supervisor is in fact not held accountable, it highly supports a finding that the purported supervisor is not actually at risk of suffering adverse consequences." *Rochelle Waste Disposal*, 673 F.3d at 596. There is more than substantial evidence to support the Regional Director's conclusion that Frenchtown failed to show charge nurses were accountable for the performance of the aides.

---

[10]That the discipline also mentions "not completing daily [weights]" is not dispositive. Frenchtown argues that since its policy makes taking the weights an aide's responsibility, this language shows that nurse Mayner was disciplined for the errors of an aide. But a charge nurse testified that if aides do not take weights, then the charge nurses simply take the weights themselves. So Mayner's discipline does not show that she was disciplined for an aide's error.

[11]At least one of the errors was nurse Ouellette's alone. Faulting Ouellette for not providing direction to staff criticizes her for poorly supervising the aides. Since one could fault an employee for failing to provide direction to other subordinate employees even when those employees are performing satisfactorily, this is Ouellette's error.

**G.    Secondary indicia of supervisory status**

Finally, Frenchtown argues that the charge nurses are supervisors because they are the highest-ranking employees in the nursing home on weekends and during the gaps between the day- and night-manager shifts. But this fact—which is only a secondary indicia of supervisory status—cannot support a finding of supervisory status where, as here, Frenchtown has failed to prove that the nurses exercise any of the 12 supervisory actions listed in 29 U.S.C. § 152(11). *See Dole Fresh Vegetables*, 334 F.3d at 487-88 (holding that the secondary indicia relied upon by the employer did not prove supervisory status in the absence of primary-indicia evidence). Moreover, "the highest-ranking employees on-site at a given time are not 'ipso facto' made into supervisors simply because of their presence." *Id.* at 489 (quoting *Highland Superstores*, 927 F.2d at 922). Further, when the undisputed managers are not at the nursing home, at least one manager is available on call. So as the Board argued, charge nurses "can, and do, seek managers' guidance and permission in supervisory matters when they need to."

Even if a secondary indicia of supervisory status could alone suffice to prove that the charge nurses are supervisors, the secondary indicia in this case on balance support the opposite conclusion. There are 45 aides, 43 charge nurses, and 7 nurse managers at the nursing home. If charge nurses were supervisors, then there would be more supervisors than employees. Such a result stands at odds with reason. Indeed, we have previously reasoned that even a ratio of one supervisor for every two employees is "suspect." *Highland Superstores*, 927 F.2d at 923.

### III. CONCLUSION

For the above reasons, we DENY Frenchtown's Petition for Review and GRANT the Board's Cross-Application for Enforcement of its Order.